No. 108,491

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

DARIC SMITH, on behalf of himself, and all others similarly situated,
*Appellants/Cross-appellees*,

v.

PHILIP MORRIS COMPANIES, INC.; PHILIP MORRIS INCORPORATED; PHILIP MORRIS INTERNATIONAL INC.; R.J. REYNOLDS TOBACCO COMPANY; BRITISH AMERICAN TOBACCO CO. LTD.; BROWN & WILLIAMSON TOBACCO CORP.; LORILLARD TOBACCO CO.; LIGGETT GROUP, INC.; and BROOKE GROUP, LTD.,
*Appellees/Cross-appellants*.

SYLLABUS BY THE COURT

1.

Federal antitrust law is intended to supplement the remedies available under Kansas law, not to replace Kansas antitrust provisions. But Kansas courts do not ignore the multitude of cases interpreting and applying federal antitrust law. On the contrary, federal precedents interpreting, construing, and applying federal antitrust law can be persuasive authority; but this is so only as long as they do not conflict with clearly dissimilar provisions in the Kansas Restraint of Trade Act, K.S.A. 50-101 *et seq*.

2.

Under Kansas law, a petition is not intended to govern the entire course of the case. Under Kansas' liberal notice-pleading rules, the only information a plaintiff is required to include in a petition is:  "(1) [a] short and plain statement of the claim showing that the pleader is entitled to relief; and (2) a demand for judgment for the relief to which the pleader deems such pleader's self entitled." K.S.A. 60-208. A plaintiff is under no obligation to categorize causes of action or cite statutory authority or common-law bases for the suit. Moreover, the substance of a petition prevails over its form, at least in the context of reviewing a dismissal of a petition for failure to state a claim under

1

K.S.A. 60-212(b)(6). Nevertheless, how a plaintiff deliberately states a claim and organizes a petition is somewhat instructive as to what claim or claims are raised in the lawsuit.

3.

How claims in a class action lawsuit are defined at the class certification stage is critical to satisfying due process requirements. Thus, while principles of notice pleading control at the outset of a case, a plaintiff must more closely define the claim or claims when seeking class certification. Such definiteness serves to properly define the class, to determine whether the filing plaintiff is a proper class representative, to define the question on which class certification is sought, and to adequately inform potential class members what claim or claims are involved so they can determine whether to opt out of class membership as provided in K.S.A. 2000 Supp. 60-223(c)(2). Likewise, a defendant in a class action case is entitled to a clear statement of the claim or claims in order to be protected against later suits by plaintiffs who failed to opt out of the class and who later assert claims identified in the class certification order and notice to the prospective class members.

4.

The certification order and class notice in a class action suit serve a purpose similar to a pretrial order:  they each more closely define the claim or claims involved than required at the outset of the case under our notice-pleading rules. But a plaintiff class is not forever bound by the claim or claims identified in the certification order. K.S.A. 2013 Supp. 60-223(c)(1)(C) permits modification of the certification order after the class has been certified.

5.

In an oligopolistic market controlled by few sellers, conscious parallelism, *i.e.*, independent conscious but parallel pricing decisions by the market

2

participants, does not, in and of itself, establish a conspiracy to fix prices in the market.

6.

It is settled law in Kansas that when reasonable minds can differ as to the conclusions drawn from the evidence, summary judgment is inappropriate. But in the context of an antitrust horizontal price-fixing case, reasonable minds cannot infer that price-fixing is afoot merely from conscious parallel pricing conduct of oligopolists. Something more must be shown to establish a reasonable inference that such competitors acted in furtherance of an illegal conspiracy.

7.

To survive a motion for summary judgment, a plaintiff seeking damages for price-fixing under the Kansas Restraint of Trade Act, K.S.A. 50-101 *et seq.*, based upon evidence of parallel pricing decisions made by competitors in an oligopoly market, must present evidence that tends to exclude the possibility that the alleged conspirators acted independently; that is, the plaintiff must present evidence that supports the existence of a price-fixing conspiracy more strongly than it supports mere conscious parallel pricing. Such evidence is referred to as "plus factors."

8.

Any showing by a plaintiff that tends to exclude the possibility of independent action can qualify as a plus factor. If a benign explanation of a defendant's action is equally plausible or more plausible than a collusive explanation, the action cannot constitute a plus factor. On the other hand, evidence that a defendant's behavior would not be reasonable or explicable (*i.e.*, not in its legitimate economic self-interest) if it were not conspiring to fix prices can constitute a plus factor.

9.

To be a viable plus factor, the evidence must make economic sense to a reasonable jury. Thus, the court must determine at the outset and as a matter of law the reasonableness of the inferences that can be drawn from the evidence.

10.

Under the facts presented, evidence of the oligopolistic structure of the cigarette market is relevant. But such evidence does not tend to exclude the possibility that the alleged conspirators acted independently. In and of itself, it does not suffice to defeat summary judgment on a claim of horizontal price-fixing among oligopolists. A plus factor must be something that tips the scales from otherwise legal synchronous conduct among competitors in an oligopoly to a price-fixing conspiracy condemned by our antitrust laws. Conscious parallelism, which is lawful conduct, arises in markets containing the very factors which define an oligopoly. Thus, these factors, which describe market characteristics for legal conscious parallelism, cannot tip the evidentiary scale out of equipoise so as to provide evidence from which a reasonable factfinder could infer illegal conduct.

11.

A jury could not reasonably infer that defendants conspired to fix prices from the mere fact that defendants had numerous opportunities to do so. The mere opportunity to fix prices without any showing that defendants actually conspired does not tend to exclude the possibility that they did not avail themselves of such opportunity or, conversely, that they actually did conspire. A price-fixing conspiracy cannot be inferred from such evidence.

12.

Under the facts presented, the use of an intermediary agency to exchange information on sales volumes does not constitute a plus factor which assists the factfinder

4

in determining whether defendants' synchronous pricing was the product of an illegal price-fixing conspiracy.

13.

Under the facts presented, and in light of the more recent history of vigorous price competition among defendants, evidence of antitrust violations more than 50 years ago is not indicative of a price-fixing agreement during the relevant time period.

14.

Evidence of actions contrary to a defendant's economic self-interest can serve as a plus factor. But courts necessarily must exercise prudence in labeling a given action as being contrary to the actor's economic interests, lest courts too quickly second guess well-intentioned business judgments of all kinds. Thus, to establish a plus factor from such evidence, it is not enough for a plaintiff to show that a particular action did not, in hindsight, ultimately work to the defendant's financial advantage. Nor is it enough to say something other than self-interest might have motivated the pricing decision. Rather, the action must tend to exclude the possibility of an independent action. Thus, if a benign explanation is equally or more plausible than a collusive explanation, the action cannot constitute a plus factor.

15.

Under the facts presented, plaintiffs' contention that defendants conspired to fix the prices of cigarettes in foreign countries, thereby diverting domestic cigarette supplies to foreign markets and increasing cigarette prices in the United States, does not constitute a plus factor to support a domestic price-fixing scheme when the market for cigarettes had been declining since the 1980's, resulting in a number of manufacturer-defendants having substantial excess production capacity with which to expand supply in order to meet any unsatisfied market demand. Evidence supporting such a theory does not tend to

5

establish defendants' domestic wholesale pricing was the product of an unlawful conspiracy.

16.

Under the facts presented, evidence that defendants conspired to suppress information on the health risks of cigarettes, thereby artificially maintaining the demand for and wholesale prices of cigarettes, does not have a tendency in reason to prove that defendants entered into an entirely separate conspiracy to fix the wholesale prices for cigarettes sold in Kansas.

17.

Appellate courts review a district court's denial of a motion to file an amended petition for any abuse of judicial discretion. Valid reasons for denying a motion to file an amended petition include (1) undue delay, (2) bad faith or dilatory motive on the part of the movant, (3) repeated failure to cure deficiencies by amendments previously allowed, (4) undue prejudice to the opposing party by virtue of allowance of the amendment, and (5) futility of amendment.

18.

Appellate courts review a district court's denial of a motion for default judgment for any abuse of judicial discretion. Default judgments are not favored in the law. Under the facts presented, the district court did not abuse its discretion in refusing to grant a default judgment to a class claiming damages of $7.58 billion.

Appeal from Seward District Court; JACK A. MURPHY, judge. Opinion filed July 18, 2014. Affirmed; cross-appeals dismissed.

*Rex A. Sharp* and *Barbara C. Frankland*, of Gunderson, Sharp & Walke, L.L.P., of Prairie Village, *Kerry McQueen*, of Sharp McQueen PA, of Liberal, and *Isaac L. Diel*, of Sharp McQueen PA, of Overland Park, for appellants/cross-appellees.

6

*Todd N. Thompson*, of Thompson Ramsdell & Qualseth, P.A., of Lawrence, and *Kenneth J. Parsigian*, of Latham & Watkins, of Boston, Massachusetts, for appellee/cross-appellant Philip Morris International Inc.

*Kenneth L. Chernof*, of Arnold & Porter LLP, of Washington, D.C., and *J. Eugene Balloun*, of Shook, Hardy & Bacon L.L.P., of Kansas City, Missouri, for appellees/cross-appellants Philip Morris USA, Inc. and Altria Group, Inc.

*Michael J. Norton*, of Foulston Siefkin LLP, of Wichita, for appellee/cross-appellant Liggett Group, LLC.

*Daniel H. Diepenbrock*, of Law Office of Daniel H. Diepenbrock, P.A., of Liberal, and *Thomas Demitrack*, of Jones Day, of Cleveland, Ohio, for appellees/cross-appellants R.J. Reynolds Tobacco Company and Brown & Williamson Tobacco Corporation.

*Scott Martin* and *Irving Scher*, of Greenberg Traurig, LLP, of New York, New York, and *Daniel H. Diepenbrock*, of Law Office of Daniel H. Diepenbrock, P.A., of Liberal, for appellee/cross-appellant Lorillard Tobacco Company.

*James A. Walker*, of Triplett, Woolf & Garretson, LLC, of Wichita, and *Benjamin Rubinstein* and *Allison M. Alcasabas*, of Herbert Smith Freehills New York LLP, of New York, New York, for appellee/cross-appellant British American Tobacco (Investments) Limited.

Before MCANANY, P.J., ARNOLD-BURGER and POWELL, JJ.

MCANANY, J.: In February 2000, Daric Smith, seeking to represent a class of Kansas retail purchasers of cigarettes (Plaintiffs), commenced this action against several tobacco companies (Defendants) in the Seward County District Court, alleging they conspired to fix the wholesale price of cigarettes in violation of the Kansas Restraint of Trade Act (KRTA), K.S.A. 50-101 *et seq*. Defendants are: Altria Group, Inc., formerly Philip Morris Companies, Inc. (Altria); Philip Morris USA, Inc., a subsidiary of Altria (PM-USA); Philip Morris International, Inc., a subsidiary of Altria until 2008 (PMI); R.J.

7

Reynolds Tobacco Company (RJR); Lorillard Tobacco Company (Lorillard); Brown & Williamson Tobacco Corporation (B&W); Liggett Group, Inc. (Liggett); and British American Tobacco (Investments) Ltd. (BATCo).

The district court certified the class with Smith as its representative. After 12 years of litigation and extensive discovery, the district court entered summary judgment for Defendants. The court found Plaintiffs failed to come forward with direct evidence or sufficient circumstantial evidence from which a jury could draw a reasonable inference of collusive behavior in fixing the wholesale price of cigarettes in Kansas. Moreover, the court found Plaintiffs' theory economically untenable. Plaintiffs appeal.

Upon de novo review, and based upon the claims and the facts established during discovery in this case, we conclude the district court did not err in entering summary judgment in favor of Defendants. As we shall see in our discussion of the court's decision in *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 28 (D.D.C. 2006), *aff'd in part and vacated in part by* 566 F.3d 1095 (D.C. Cir. 2009), *cert. denied* 130 S. Ct. 3502, *reh. denied* 131 S. Ct. 57 (2010), which we refer to in this opinion as the *RICO* case, the tobacco industry has many things to answer for to the consumers of its products. But based upon the facts before us, a conspiracy among these Defendants to fix the wholesale prices of cigarettes in Kansas in violation of the KRTA is not one of them.

*Introduction*

The tobacco industry is a classic example of an oligopoly, with a small number of companies controlling the majority of the market. Defendants PM-USA, RJR, B&W, Lorillard, and Liggett (Manufacturing Defendants) collectively manufactured more than 97% of the cigarettes sold in the United States during the relevant time period. The Manufacturing Defendants sell to wholesalers at list prices, which are published to wholesalers on a regular basis. The wholesalers independently set their own prices to

retailers, and the retailers then set their own prices for consumers. But the ultimate price to the consumer is affected by a wide variety of discounts, promotions, and rebates to wholesalers provided by Manufacturing Defendants. See *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 239, 113 S. Ct. 2578, 125 L. Ed. 2d 168 (1993); *RICO* case, 449 F. Supp. 2d at 948.

Plaintiffs contend, at a minimum, that Defendants, pursuant to a conspiracy to fix the wholesale prices of cigarettes in the United States, engaged in lock-step price increases beginning on November 1, 1993, following a 7-month period of vigorous price competition. Before we further explore the breadth of Plaintiffs' conspiracy claim or claims, which is a key source of contention on appeal, we briefly consider the circumstances of the cigarette market leading up to that point.

By 1980, the demand for cigarettes in the United States was in decline, resulting in substantial excess capacity among the various manufacturers. Liggett, whose market share declined over the years from over 20% to barely 2%, responded by introducing in 1980 generic cigarettes at a list price of about 30% less than the regular brands. As the sale of Liggett's generics increased, RJR responded in 1983 with its own generic brand, and B&W followed suit in the spring of 1984. Throughout the 1980's and early 1990's, the discount segment of the cigarette market grew dramatically, taking market share away from premium brands, such as PM-USA's flagship brand Marlboro. By 1993, discount cigarettes accounted for 38.9% of industry shipments.

The growing discount segment had a particularly negative effect on PM-USA, with Marlboro losing market share at an accelerated rate for the first time in decades. For Marlboro to remain competitive, PM-USA concluded it needed to narrow the gap between the price of Marlboro and the lowest priced discount brands.

9

Thus, on April 2, 1993, a day which came to be known as "Marlboro Friday," PM-USA announced a nationwide Marlboro retail promotion that reduced retail prices by an average of 40 cents per pack, or approximately 20%. Four months later, PM-USA followed this retail promotion with national wholesale list price reductions on all of its premium and discount brands.

These moves successfully reduced the price gap between Marlboro and the discount brands, resulting in Marlboro regaining its market share. The other Manufacturing Defendants followed PM-USA's price moves. Plaintiffs contend these price moves were the result of an illegal combination or conspiracy to fix prices. On the other hand, Defendants contend they made these pricing moves independent of one another. As support, they point to uncontroverted evidence that they argue is inconsistent with the notion of these pricing moves being the product of an agreement among competing suppliers.

The scope of Plaintiffs' claim or claims against Defendants became a key source of contention in the district court and remains so in this appeal. The case is now before us because the district court found Plaintiffs stated only a claim for a wholesale price-fixing conspiracy and granted Defendants summary judgment on that claim.

Plaintiffs' contentions on appeal center on two points. First, they insist the district court too narrowly interpreted the scope of their restraint-of-trade claim. Second, they contend that even if we find otherwise, summary judgment on a wholesale price-fixing claim is improper under Kansas law.

*Standard of review*

In our de novo review of Defendants' motions for summary judgment, we apply the same summary judgment standards as those applied by the district court. Those

standards dictate that summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. We resolve all facts and inferences that may *reasonably* be drawn from the evidence in favor of Plaintiffs, the party against whom the summary judgment was sought. We must deny Defendants' summary judgment motions if reasonable minds could differ as to the conclusions drawn from the evidence. See *O'Brien v. Leegin Creative Leather Products, Inc.*, 294 Kan. 318, 330, 277 P.3d 1062 (2012) (*O'Brien I*).

## SCOPE OF PLAINTIFFS' CLAIM

Defendants tell us this is one of many antitrust cases filed across the country involving the same claim against some of them for conspiring to fix the wholesale prices of cigarettes following Marlboro Friday. All of those other cases have now been either voluntarily dismissed or ended in summary judgment for the tobacco companies. See, *e.g.*, *Holiday Wholesale Grocery v. Philip Morris Inc.*, 231 F. Supp. 2d 1253, 1329 (N.D. Ga. 2002), *aff'd sub nom. Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003) (granting summary judgment against class of cigarette wholesalers in multidistrict litigation [MDL] on wholesale price-fixing claim brought against PM-USA, RJR, B&W, and Lorillard under federal antitrust law); *Romero v. Philip Morris Inc.*, 148 N.M. 713, 729-32, 242 P.3d 280 (2010) (applying *Williamson Oil* analysis in affirming summary judgment for same tobacco companies involved in this case on claim of wholesale price-fixing conspiracy brought by class of indirect cigarette purchasers under New Mexico's antitrust laws); *Ren v. Philip Morris Companies, Inc.*, No. 00-004035-CZ, unpublished Michigan Circuit Court opinion filed September 10, 2003 (same under Michigan antitrust law). Defendants insist the district court properly held the same result is proper in this case brought under the KRTA.

11

*The governing substantive law*

Before we determine what claim or claims are involved in this case, a brief overview of the governing law is in order. First, we note that substantial changes to the KRTA were enacted by our legislature in response to our Supreme Court's opinion in *O'Brien I*. Those changes were effective April 18, 2013, but do not apply retroactively to cases, like this one, already pending at the time. See K.S.A. 2013 Supp. 50-164; *Owen Lumber Co. v. Chartrand*, 276 Kan. 218, 220-21, 73 P.3d 753 (2003). Those changes included:  (1) The repeal of the full-consideration damages provision in K.S.A. 50-115, which allowed a successful plaintiff to recover the full consideration paid for goods "controlled in price by such combination" and which are claimed by Plaintiffs in our present case; (2) a declaration that provisions of the KRTA shall be "construed in harmony" with the United States Supreme Court's interpretations of federal antitrust law; and (3) permitting a rule-of-reason analysis by an explicit allowance for "reasonable restraint[s] of trade or commerce." K.S.A. 2013 Supp. 50-163(b), (c); L. 2013, ch. 102, sec. 7. Our present case proceeds under the pre-April 18, 2013, version of the KRTA.

Both the KRTA and its federal counterpart, the Sherman Act, 15 U.S.C. § 1 (2012) *et seq.*, contain broad language that bans a wide range of activities that restrict or restrain trade. Section 1 of the Sherman Act broadly declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. The cases are legion in which federal courts have been called upon to interpret and to apply this language. Federal antitrust law, however, does not control here. Rather, as our Supreme Court recently stressed, "federal antitrust law is intended to supplement the remedies available under Kansas law, not to replace Kansas antitrust provisions." *O'Brien I*, 294 Kan. at 322. But we do not ignore the multitude of cases interpreting and applying the Sherman Act. On the contrary, federal precedents interpreting, construing, and applying federal antitrust law can be persuasive authority; but this is so only as long as they do not

12

conflict with clearly dissimilar provisions in the KRTA. See 294 Kan. at 322, 342-43. We will come back to these principles later.

In their first amended petition, under which this case has been litigated since March 2001, Plaintiffs broadly alleged that Defendants violated "K.S.A. 50-101 through K.S.A. 50-117, K.S.A. 50-139 through K.S.A. 50-147, and K.S.A. 50-801." But our review of the vast record reveals that Plaintiffs' substantive statutory focus has consistently been K.S.A. 50-112, from their successful efforts resisting Defendants' early efforts to have this action dismissed for failure to state a claim to the more recent battles over the appropriateness of summary judgment. Moreover, full-consideration damages under K.S.A. 50-115 that Plaintiffs seek were the focus of their expert witnesses' report in support of class certification. Full-consideration damages are only available under K.S.A. 50-115 for violations of K.S.A. 50-112 (and the unrelated prohibitions of K.S.A. 50-113 involving the creation of certain trusts). See *O'Brien v. Leegin Creative Leather Products, Inc.*, No. 108,988, 2014 WL 1362657, at *7-8 (Kan. App. 2014) (unpublished opinion) (*O'Brien II*). K.S.A. 50-112 is clearly where we must focus our attention.

K.S.A. 50-112 broadly declares the following to be "against public policy, unlawful and void":

"[A]ll arrangements, contracts, agreements, trusts, or combinations between persons made with a view or which tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state, or in the product, manufacture or sale of articles of domestic growth or product of domestic raw material, . . . and all arrangements, contracts, agreements, trusts or combinations between persons, designed or which tend to advance, reduce or control the price or the cost to the producer or to the consumer of any such products or articles . . . or any other services . . . ."

We can envision a wide variety of concerted activities in restraints of trade that might fall under the broad proscription of K.S.A. 50-112. Businesses arguably could

13

violate K.S.A. 50-112 by allocating customers or sales territories, agreeing not to compete on a particular product line, agreeing to limit production or variations in the quality of competing products, controlling hours of operation, or agreeing to fix prices. These examples do not exhaust the possibilities. But the issue here is the theory or theories Plaintiffs have pursued in this case.

In response to Smith's original petition, Defendants filed various motions to dismiss for failure to state a claim and, in the alternative, asked the court to coordinate the discovery in this case with the discovery taking place in the federal MDL that ultimately led to the decision in *Williamson Oil*. In their written opposition to those motions, Plaintiffs consistently referred to a "fraudulent price fixing conspiracy" or "the price fixing agreement," to Defendants as "alleged price fixing conspirators," and to Defendants' various detrimental acts as "price fixing." In at least one early pleading, Plaintiffs even cross-referenced smoking and health conspiracies that were being raised elsewhere as separate from the conspiracy they were raising in this case. More specifically, in responding to at least one motion to dismiss filed prior to class certification, Plaintiff Smith rebutted certain foreign Defendants' suggestions that discovery on the issue of whether the court could exercise jurisdiction over them would be unduly burdensome by noting: "Foreign Defendants admit that their domestic subsidiaries have already 'posted millions of pages of its documents on the internet' in smoking and health actions." Plaintiffs then argued:

> "It is virtually common knowledge that the tobacco companies have been attempting to create shells of corporations in an effort to avoid the inevitable massive liability for *their prior conspiracies on addictive nicotine and cigarette cancer causing issues* which have now come home to roost in one case in Florida in which the domestic subsidiaries alone have been hit for $145 billion. It is no small wonder that Foreign Defendants are looking to protect their own assets, but much of this shell game was done *after the conspiracy set forth herein began* and much of the Foreign Defendants['] shells were set up from the unfair profits of the conspirators." (Emphasis added.)

14

During a hearing on the motions to dismiss conducted in August 2000, Plaintiffs distinguished their case from the federal MDL solely on the bases that the federal procedural rules, laws of evidence, and substantive law that governed the MDL case differed from Kansas law. In particular, they focused on the distinction between the class in the MDL (direct purchasers) versus the class they proposed (indirect purchasers). They never suggested during these early proceedings that they were raising a substantive claim other than a wholesale price-fixing conspiracy.

In March 2001, Plaintiffs filed their first amended petition, the pleading under which this case has been litigated since then.

Under Kansas law, a petition is not intended to govern the entire course of the case. *Berry v. National Medical Services, Inc.*, 292 Kan. 917, 918, 257 P.3d 287 (2011). In fact, under Kansas' liberal notice-pleading rules, the only information Plaintiffs were required to include in their petition was: "(1) A short and plain statement of the claim showing that the pleader is entitled to relief; and (2) a demand for judgment for the relief to which the pleader deems such pleader's self entitled." K.S.A. 60-208; see also *Oller v. Kincheloe's, Inc.*, 235 Kan. 440, 446-48, 681 P.2d 630 (1984) (outlining various principles underlying concept of notice pleading under Kansas law). Plaintiffs were under no obligation to categorize their causes of action or cite statutory authority or common-law bases for the suit. See *Golden v. Den-Mat Corporation*, 47 Kan. App. 2d 450, 461, 276 P.3d 773 (2012). Moreover, the substance of a petition prevails over its form, at least in the context of reviewing a dismissal of a petition for failure to state a claim under K.S.A. 60-212(b)(6). See *Baska v. Scherzer*, 283 Kan. 750, 755, 156 P.3d 617 (2007).

Nonetheless, how Plaintiffs deliberately organized their first amended petition is somewhat instructive on just what claim or claims they raised in their lawsuit. Plaintiffs' first amended petition is divided into 55 numbered paragraphs which fall under 9 main sections. Plaintiffs assigned the following headings to those sections:

15

I.      NATURE OF THIS ACTION

II.      PARTIES

III.      CO-CONSPIRATORS, AIDERS AND ABETTORS, AND JOINT VENTURERS

IV.      JURISDICTIONAL ALLEGATIONS

V.      CLASS ACTION ALLEGATIONS

VI.      TRADE AND COMMERCE IN KANSAS

VII.      FACTUAL BACKGROUND

       A.      General Price Fixing Information

       B.      Violation of Antitrust Laws

       C.      The Illegal Effect on Markets in Kansas

       D.      Fraudulent Concealment, Equitable Tolling, Discovery Rule, Continuous Tort

VIII.      INJURY TO PLAINTIFF AND PLAINTIFF'S CLASS

IX.      PRAYER FOR RELIEF.

In the prayer for relief and at various points throughout their petition, Plaintiffs consistently referred broadly to a singular "unlawful combination and conspiracy alleged [t]herein." The same is true of the "class allegations," particularly with regard to the questions of law and fact alleged to be common to the class. Plaintiffs specifically detailed how that "combination and conspiracy" violated the KRTA under section VII. B. of their first amended petition. That section opens with the allegation that "[b]eginning no later than November 1, 1993[,] Defendants and their co-conspirators entered into and engaged in a combination and conspiracy to suppress and eliminate competition *by fixing the price of Cigarettes* offered for sale to customers in this state and elsewhere." (Emphasis added.) Allegations under that same subheading continue:

"43. Specifically, Defendants illegally:

"a. created or carried out restrictions in trade or commerce, by e.g. *setting by agreement the prices which the Defendants charged for Cigarettes* which, directly or indirectly, were sold in Kansas;

"b. prevented competition in the manufacture or sale of Cigarettes sold, directly or indirectly, in Kansas *by, agreeing among themselves not to compete over prices*;

"c. *fixed the price of Cigarettes* in such a way as to inflate, stabilize, control or establish, at least in part, the prices paid in Kansas;

"d. entered into, executed, and carried out contracts, obligations, and agreements in which they: (i) *bound themselves not to sell Cigarettes below a fixed price*; (ii) *agreed to keep the prices of Cigarettes at a fixed price*; (iii) *coordinated price increases*; and (iv) *established and settled the price of Cigarettes* so as to directly or indirectly preclude a free and unrestricted competition among themselves and other co-conspirators; and

"e. issued *price announcements and price quotations in accordance with the above-described agreements*.

. . . .

"47. [Plaintiffs] were injured in their trade or business by reason of the unlawful acts of Defendants as alleged herein (the wholesaler and distributors who directly purchased Cigarettes from the Defendants paid higher prices for Cigarettes and then passed on these additional costs to their customers and to the ultimate consumers). As a result, [Plaintiffs] were forced to pay higher prices for the Cigarettes they purchased than they would have had to pay if the prices charged by Defendants to their customers were the product of fair and open competition and not of *an illegal price-fixing agreement*.

"48. During the period of the conspiracy, Defendants and other co-conspirators held meetings during which they agreed to and did [eliminate], suppress and limit competition by:

"a. *discussing the prices and volumes of Cigarettes*;

"b. *agreeing to increase and maintain prices on Cigarettes*; and

"c. discussing and agreeing on methods to conceal the agreements and carrying out the charged conduct.

17

"49.     Defendants have issued *price announcements in accordance with the agreements*, and have participated in meetings and conversations to monitor and enforce *adherence to the agreed-upon prices* in the United States, including the State of Kansas." (Emphasis added.)

The remaining sections of the first amended petition, likewise, focus solely on allegations of conspiratorial price-fixing by Defendants.

But Plaintiffs now insist their claim has never been limited to domestic or national wholesale price-fixing. To the contrary, they proclaim in their appellate brief they have always "alleged an international non-price and price conspiracy." They describe that claim as a "'restraint of trade claim,'" with three distinct components:

(1) A domestic wholesale price-fixing conspiracy like that involved in the federal MDL.

(2) A "demand-shift" or "smoking and health" conspiracy based on allegations that Defendants kept the demand for cigarettes artificially high, thereby keeping the price high by, for example, concealing information, falsely advertising, and actively misleading the public about what they knew concerning the addictive nature of nicotine and the adverse effects of smoking on health. They alleged that "[i]f consumers had received full, accurate information regarding the adverse effects of cigarettes, including how addictive cigarettes were, they would have purchased fewer cigarettes, demand would have been lower, and the price lower."

(3) A "supply-restriction" or international price-fixing conspiracy based on allegations that Defendants conspired to fix the price of cigarettes in foreign countries, thereby "'increas[ing] the incentive to export cigarettes,'" which,

18

in turn, reduced domestic cigarette supply, causing an increase in domestic cigarette prices.

According to Plaintiffs, the smoking and health conspiracy has always been the "core theory" and "biggest and best part" of their case. They also insist the nonprice, smoking and health component of their restraint-of-trade claim is based on the same activities that underlie the charges brought by the United States Department of Justice against the same tobacco companies who are Defendants in our case for violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968. Those RICO charges ultimately led to a 9-month bench trial in an "extraordinarily complex case" that resulted in an almost 1,000-page decision by the federal district court in *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 28 (D.D.C. 2006), *aff'd in part and vacated in part by* 566 F.3d 1095 (D.C. Cir. 2009), *cert. denied* 130 S. Ct. 3502, *reh. denied* 131 S. Ct. 57 (2010) (the *RICO* case). In its prefatory summary to that opinion, the federal district court found: "In short, Defendants have marketed and sold their lethal product with zeal, with deception, with a single-minded focus on their financial success, and without regard for the human tragedy or social costs that success exacted." 449 F. Supp. 2d at 28. The court further held the government produced "overwhelming evidence to support most of [its] allegations" that, "for approximately fifty years," Defendants violated RICO (specifically 18 U.S.C. § 1962[c] and [d] by

"falsely and fraudulently den[ying]: (1) that smoking causes lung cancer and emphysema (also known as chronic obstructive pulmonary disease ('COPD')), as well as many other types of cancer; (2) that environmental tobacco smoke causes lung cancer and endangers the respiratory and auditory systems of children; (3) that nicotine is a highly addictive drug which they manipulated in order to sustain addiction; (4) that they marketed and promoted low tar/light cigarettes as less harmful when in fact they were not; (5) that they intentionally marketed to young people under the age of twenty-one and denied doing so; and (6) that they concealed evidence, destroyed documents, and abused the attorney-

19

client privilege to prevent the public from knowing about the dangers of smoking and to protect the industry from adverse litigation results." 449 F. Supp. 2d at 27.

In support of Plaintiffs' contention that they claim a conspiracy to maintain cigarette prices by hiding the deleterious effects of tobacco, Plaintiffs point to various allegations in their first amended petition, but they particularly rely upon Paragraph 33, which appears immediately between the heading "VII. FACTUAL BACKGROUND" and subheading "A. General Price Fixing Information." Paragraph 33 states:

"Defendants, along with their affiliates, combined and conspired on a *worldwide basis* which adversely effected [*sic*] the United States, including Kansas. *Defendants' conspiracy included price-fixing agreements as well as non-price agreements*, which helped provide a foundation and support mechanism for the price-fixing conspiracy. *Defendants' non-price agreements included, but were not limited to, the joint creation of false impressions regarding the health effects of cigarette smoking*; the joint control of internal scientific research; the joint control of product advertising; the joint restriction from researching and introducing 'safer' cigarettes; the joint use of legal counsel and others to hide their conspiracy; and the joint coordination of marketing activities. The price fixing conspiracy was intended to directly enhance the profitability of the industry as a whole, and thereby each individual company, and even included an integrated enforcement mechanism so that the group could 'retaliate' against any unilateral activity by an individual company defendant. This broad conspiracy lasted from at least November 1, 1993 to the present (the 'Class Period')." (Emphasis added.)

The primary nonprice conspiracies Plaintiffs refer to here are: (1) The claimed conspiracy to fix cigarette prices in foreign markets and thereby artificially affect the available supply of cigarettes in the domestic market, and (2) the conspiracy among Defendants to hide from the public the deleterious effects of smoking, thereby artificially affecting the demand for cigarettes. Plaintiffs describe these as "help[ing] provide a foundation and support mechanism for the price-fixing conspiracy." We will discuss these theories later in some detail.

20

Defendants respond that Plaintiffs are improperly trying to proceed on entirely different conspiracy theories than the price-fixing theory under which Plaintiffs obtained class certification. They urge us to instead agree with the district court's ultimate conclusion that Plaintiffs stated only a claim for a wholesale price-fixing conspiracy.

The parties' opposing positions demonstrate that we cannot resolve the issue of the nature of Plaintiffs' claim or claims simply by referring to the first amended petition. Accordingly, we look further into the proceedings below to see just what claim or claims were involved.

The next major step in the proceedings involved Plaintiffs' motion for class certification. There are four statutory threshold prerequisites to bringing a class action in Kansas. A class action is only proper if (1) the number of class members is so large that joinder of all members is impracticable; (2) the class claims present common questions of fact or law; (3) the named parties' claims and defenses are representative of the claims and defenses of the other class members; and (4) the class representatives will fairly and adequately protect the interests of the class as a whole. K.S.A. 2000 Supp. 60-223(a). These threshold elements are commonly identified in shorthand as "(1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation." *Dragon v. Vanguard Industries, Inc.*, 277 Kan. 776, 778, 89 P.3d 908 (2004). Plaintiffs sought class certification under K.S.A. 2000 Supp. 60-223(b)(3). At the time, that statute required, as it still does today, that to certify a class, the court must find: "[Q]uestions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." K.S.A. 2000 Supp. 60-223(b)(3). The statute continued:

"The matters pertinent to the findings include: (A) The interest of members of the class in prosecuting or defending separate actions; (B) the extent and nature of any litigation

21

concerning the controversy already begun by or against members of the class; (C) the appropriate place for maintaining, and the procedural measures which may be needed in conducting, a class action." K.S.A. 2000 Supp. 60-223(b)(3).

Notably, in insisting this case satisfied the statutory threshold prerequisites for a class action, Plaintiffs never disputed that they were raising the same wholesale price-fixing claim raised in the federal MDL. In their motion for class certification, Plaintiffs even referred to the then-pending MDL as "the parallel federal direct purchaser action." They distinguished their case primarily on the bases that they were a class of indirect purchasers and that certain applicable substantive law and procedural rules varied.

We need only look to the introduction to the motion for class certification filed in February 2001 to demonstrate the point. That introduction states:

"Plaintiff moves this Court to certify a class consisting of persons who were indirect purchasers of cigarettes in Kansas and victims of a conspiracy to fix prices and allocate markets for the sale of cigarettes. For almost a decade, the world's largest cigarette manufacturers met in secret to agree upon the method to artificially raise the prices of cigarettes sold in the United States and Kansas. These price increases were passed on through the distribution chain such that prices to Kansas consumers were artificially increased for an extended period of time.
"There is currently a consolidated federal direct purchaser class action pending in the Northern District of Georgia [the federal MDL] which involves the same Defendants (except Liggett Group, Inc. and Brooke Group Ltd.) and *alleges the same basic conspiracy as alleged in this matter*. In the federal action, the Defendants have recognized the amenability of the cigarette industry to class treatment and have already stipulated to a class action for a four year class period. . . . The federal court certified the class on January 23, 2001." (Emphasis added.)

Reading further into the motion only confirms the point. Following this introductory paragraph, Plaintiffs set forth allegations almost identical to those found in

22

the "factual background" section of their first amended petition. They included the same language found in Paragraph 33 of their petition as quoted above in the motion, which they characterized as "factual information" that "supports Plaintiff's allegations of Defendants' antitrust violations," not as separate conspiracy claims common to the proposed class. From there, Plaintiffs emphasized that they raise a "<u>single</u>" horizontal price-fixing conspiracy in arguing that the requirements for certifying a class in K.S.A. 2000 Supp. 60-223(a) and K.S.A. 2000 Supp. 60-223(b)(3) were satisfied. Plaintiffs did not take a contrary position during any of the ensuing hearings on various aspects of class certification. Moreover, the report of Plaintiffs' expert witness at the class certification stage focused almost exclusively on the three available theories or methods that may be available for calculating the class' damages "due to an unlawful conspiracy to fix the wholesale price of cigarettes from November 1, 1993 to the present."

Defendants' joint response in opposition to the motion for class certification identified Plaintiffs' claim as involving only wholesale price-fixing as well. Defendants' focus was upon a lack of a common class-wide method for proving impact and damages for each member of the putative class of indirect purchasers. Plaintiffs' reply did not suggest in any way that they had raised any broader claim.

The district court ultimately found the proposed class suitable for certification and granted Plaintiffs' motion. In making its findings concerning the statutory threshold prerequisites for a class action, the court identified wholesale price-fixing as the class' claim in its certification order. In particular, the court noted: "There is but a single conspiracy claimed by the Plaintiffs in this case and if it is proven, it affects all of the proposed class members equally." The certification order defines the class as: "'All natural persons who indirectly purchased cigarettes in the State of Kansas for consumption and not for resale from any of the Defendants, or any parent, subsidiary or affiliate thereof or their co-conspirators at any time from November 1, 1993 to the present.'"

23

During proceedings to determine the form of notice to be provided to prospective class members, Plaintiffs persisted in their position that they stated only a claim for a nationwide wholesale price-fixing conspiracy. In fact, in the class notice proposed by Plaintiffs, they described the background of their case as follows:

> "The Plaintiff Class, which is a Kansas Class of consumers of cigarettes, allege that since November 1, 1993, [Defendants] have *unlawfully agreed to fix the wholesale price of cigarettes* and that, as a result, [indirect] buyers of cigarettes in Kansas have paid higher prices than they otherwise would have paid. The Defendants deny liability and have denied these claims and charges." (Emphasis added.)

The notice ultimately approved by the district court and served on potential class members tracks this language.

How claims are defined at the class certification stage is critical to satisfy due process requirements. See *Mullane v. Central Hanover Tr. Co.*, 339 U.S. 306, 314-15, 70 S. Ct. 652, 94 L. Ed. 865 (1950) (generally observing that notice and opportunity to be heard are fundamental requisites of the constitutional guarantee of procedural due process in context of discussing propriety of class action notice by publication). As explained in *Mullane*, 339 U.S. at 313, "[m]any controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." See *DeJulius v. New England Health Care Emp. Pension*, 429 F.3d 935, 943-44 (10th Cir. 2005) (citing Fifth Amendment to the United States Constitution; *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173, 94 S. Ct. 2140, 40 L. Ed. 2d 732 [1974]; and *Mullane*, 339 U.S. at 313, in pointing out that "[i]n addition to the requirements of Rule 23, the constitution's Due Process Clause also guarantees unnamed class members the right to notice of certification or settlement").

24

Our own Supreme Court has explained in discussing due process principles underlying the requirements of class notice:

> "The class action is premised on the theory that members of the class who are not before the court can justly be bound because the self-interest of their representative coincides with the interest of the members of the class and will assure adequate litigation of the common issues. Where the interests of absent class members have not been adequately represented, binding them by the class judgment would seem to offend the requirements of due process. (*Hansberry v. Lee*, [311 U.S. 32, 61 S. Ct. 115, 85 L. Ed. 22 (1940)].) Notice to absent members of the class in this regard is particularly important, for it is the greatest single safeguard against inadequate representation. (*Mullane*, [339 U.S.] at 314.)" *Shutts, Executor v. Phillips Petroleum Co.*, 222 Kan. 527, 556, 567 P.2d 1292 (1977).

Accord *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 621, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997) (noting counterparts to K.S.A. 2000 Supp. 60-223[a] and [b] found in Rule 23 of Federal Rules of Civil Procedure [FRCP], "focus court attention on whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives"). Our Supreme Court has further commented on this subject:

> "'Class actions are designed to provide an "economical means for disposing of similar lawsuits" while simultaneously "protecting defendants from inconsistent obligations and the due process rights of absentee class members." [Citations omitted.] The underlying question in any class action certification is whether the class action device provides the most effecting and just method to resolve *the controversy at hand*.' [Citation omitted.]" (Emphasis added.) *Critchfield Physical Therapy v. The Taranto Group, Inc.*, 293 Kan. 285, 303-04, 263 P.3d 767 (2011).

See 3 Rubenstein, Newberg on Class Actions § 7:26 (5th ed. 2013) (discussing due process principles underlying requirement in FRCP 23(c)(1)(B) that "'[a]n order that

25

certifies a class action must define the class and the class claims, issues, or defenses,'" which language mirrors statutory language currently found in K.S.A. 2013 Supp. 60-223[c] but was not part of K.S.A. 2000 Supp. 60-223 when the court issued the certification order in this case).

Thus, we conclude that while principles of notice pleading control at the outset of a case, a plaintiff must necessarily more closely define the claim or claims when seeking class certification. Such definiteness serves to properly define the class, to determine whether the filing plaintiff is a proper class representative, to define the question on which class certification is sought, and to adequately inform potential class members of what claim or claims are involved so they can determine whether to opt out of class membership as provided under K.S.A. 2000 Supp. 60-223(c)(2).

Our courts have not yet considered at length the need to define the claim or claims at the class certification stage, but the federal courts have. For example, the United States Supreme Court has explained:

> "As we noted in *Coopers & Lybrand v. Livesay*, 437 U.S. 463, [469, 98 S. Ct. 2454, 57 L. Ed. 2d 351 (1978)], 'the class determination generally involves considerations that are "enmeshed in the factual and legal issues comprising the plaintiff's cause of action."' [Citations omitted.] Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982).

The Third Circuit Court of Appeals also considered the necessity of defining the claim or claims at the class certification stage in *Wachtel v. Guardian Life Ins. Co.*, 453 F.3d 179, 184 (3d Cir. 2006). That court ultimately held:

26

"[T]he proper substantive inquiry for an appellate tribunal reviewing a certification order for Rule 23(c)(1)(B) compliance is whether the precise parameters defining the class and a complete list of the claims, issues, or defenses to be treated on a class basis are readily discernible from the text either of the certification order itself or of an incorporated memorandum opinion." 453 F.3d at 185.

In arriving at this holding, the Third Circuit explained several policy reasons underlying the need for a clear definition of the class' claim or claims at the certification stage. We find the following discussion by the Third Circuit particularly pertinent here:

"We acknowledge that class actions often present extraordinarily complex factual and legal scenarios, such that a complete list of the claims, issues, or defenses appropriate for class treatment may be difficult to discern or articulate at the time of certification. In addition, the 2003 amendments to the Rule eliminated so-called 'conditional' certifications—formerly available under Rule 23(c)(1)(C)—such that a trial court may not certify only a limited list of class claims or issues while explicitly delaying decision on other claims. The potential difficulty posed by the requirements of Rule 23(c)(1)(B), however, is tacitly acknowledged and directly mitigated by amended Rule 23(c)(1)(C), which allows that a certification order may be 'altered or amended' at any time 'before final judgment.' Furthermore, to the extent that circumstances genuinely warrant some evolution in the matters to be treated on a class basis in a given action, the full and clear articulation of those claims, issues, or defenses intended to be treated on a class basis at the time of the original certification order will provide a defined status quo that likely will serve to streamline any later process of adjustment." 453 F.3d at 186-87 n.8.

Granted, when the class was certified in this case approximately 13 years ago, K.S.A. 2000 Supp. 60-223 did not explicitly include the requirement to define the claim or claims involved. Moreover, the class was certified before much of the discovery was conducted, and there has not yet been a pretrial conference in this case. Nonetheless, we conclude that the certification order and class notice serve a purpose similar to a pretrial order: they each necessarily more closely define the claim or claims involved than required early in the case under our notice-pleading rules.

27

This is not to say that a plaintiff class is forever bound by the claim or claims identified in the certification order. On the contrary, there are statutory provisions allowing for modification of the certification order after the class has been certified. See K.S.A. 2013 Supp. 60-223(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."); accord *General Telephone*, 457 U.S. at 160 (noting that under Rule 23 of FRCP, "[e]ven after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation. . . . This flexibility enhances the usefulness of the class-action device; actual, not presumed, conformance with Rule 23[a] remains, however, indispensable.").

To the extent that such a modification materially alters the nature of the claim or relief sought, it seems to us that the same due process principles discussed above dictate that an amended notice would need to be provided to class members. Here, Plaintiffs did not move to file a second amended petition until after the court's determination in July 2011 that they had alleged only a singular claim of price-fixing that was unrelated to the smoking and health conspiracies litigated in the *RICO* case. Even then, they explicitly did so only to "clarify" that they had always raised a broader "restraint of trade" claim with both price and nonprice components. Plaintiffs never sought to modify the class certification order or to serve an additional class notice when discovery was complete, when Defendants moved for summary judgment, or even when the district court ruled that Plaintiffs' claim was limited to a wholesale price-fixing conspiracy.

Applying these due process principles to the facts of this case, we find the wholesale price-fixing claim on which the class was certified and notice was provided to be significantly distinct from the nonprice component or smoking and health component that Plaintiffs contend was part of their case from the beginning. A class member deciding not to opt out of a price-fixing class would have no reason to believe that he or she would also be barred from bringing a future action for an antitrust conspiracy not involving direct price-fixing, such as rigging the market supply or artificially maintaining

28

demand by means of misstatements and misrepresentations about the health effects of smoking. Further, a defendant in a class action case is entitled to be protected against later suits by plaintiffs who failed to opt out of the class and who later assert claims identified in the class certification order and notice to the prospective class members.

Our conclusion on the breadth of Plaintiff's claim is not altered by the discovery proceedings both prior to and after the class was certified in this case.

Despite Plaintiffs' insistence to the contrary, the breadth that Plaintiffs now attribute to their claim was never specifically recognized by the district court during the decade of litigation that led to this appeal. After 9 years of litigation, Judge Tom R. Smith retired and ultimately Senior Judge Jack A. Murphy was assigned to this case and made the rulings now subject to appeal. Plaintiffs contend that Judge Smith held they had always stated the much broader claim of an international restraint-of-trade conspiracy and that he repeatedly "rejected" Defendants' attempts to limit Plaintiffs' claim to a domestic price-fixing conspiracy. Plaintiffs have cited to various points in the record where they *argued* before Judge Smith that their claim was much broader than a wholesale price-fixing conspiracy. But Plaintiffs fail to cite where in the record Judge Smith ever ruled, as they suggest, that their claim was indeed substantially broader. Defendants tell us this is because he never did.

Indeed, in our close, independent review of the vast record of Judge Smith's oral and written rulings over the years on Plaintiffs' various discovery motions, we did not find that Judge Smith ever explicitly ruled that Plaintiffs stated a claim broader than the wholesale price-fixing claim identified in the class notice. Rather, in granting Plaintiffs' motions to compel, Judge Smith either overruled Defendants' privilege objections or found the documents were minimally relevant *because they mentioned price* and, therefore, were discoverable. That those documents also reflect conduct relevant to Plaintiffs' arguments that they have always stated a broader claim does not, by

29

implication alone, mean that Judge Smith agreed or ruled they had, indeed, stated a claim for anything other than wholesale price-fixing.

Defendants eventually shifted the focus of their ongoing objections to objections based on claims of privilege. Disputes over these objections—particularly whether the joint-defense privilege is recognized under Kansas law—prompted Judge Smith's appointment of Judge Paul Buchanan as a special master. Plaintiffs suggested to Judge Buchanan that their claims mirrored those in the *RICO* case, so they argued the crime-fraud exception to the attorney-client privilege that was applied in the *RICO* case applied here as well. But Judge Buchanan rejected Plaintiffs' attempts to equate their case to the *RICO* case, stating: "This is an anti-trust price fixing case, and therefore the crime fraud found in [the *RICO*] case does not apply to this case." And Judge Smith subsequently overruled Plaintiffs' objections to this conclusion.

Plaintiffs suggest on appeal that they justifiably relied upon Judge Smith's ruling that they had, indeed, stated the broader claim to formulate their litigation strategy and to now hold otherwise would somehow be inequitable. They argue that "[i]n reliance on [Judge Smith's] repeated rulings," they retained experts and otherwise prepared to litigate their more broad claims of "restraints of trade resulting from the price and non-price conspiracy which adversely effected [*sic*] price directly as well as indirectly by supply restriction and demand enhancement." Their argument continues: "In further reliance thereon," the class did not amend their pleading to provide more detail on their theory of the case.

Plaintiffs cite no authority in support of their suggestion that they can be excused on equitable principles of justifiable reliance for taking or not taking certain procedural steps in the course of their litigation based on their perception of the district court's rulings. Accordingly, we hold that they have waived any reliance argument. See *State v. Berriozabal*, 291 Kan. 568, 594, 243 P.3d 352 (2010) (holding failure to support

30

argument with pertinent authority or to show why argument is sound despite lack of supporting authority or in face of contrary authority is akin to failing to brief issue, meaning it is deemed waived and abandoned).

To the extent the parties suggest that we should apply principles of the common-law doctrine of judicial estoppel here, we do not find the circumstances of this case call on us to exercise our discretion to apply that doctrine. See *State v. Hargrove*, 48 Kan. App. 2d 522, 548-549, 293 P.3d 787 (2013) (citing *New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S. Ct. 1808, 149 L. Ed. 2d 968 [2001], and *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8, 120 S. Ct. 2143, 147 L. Ed. 2d 164 [2000], in discussing common-law doctrine of judicial estoppel).

In sum, we conclude that Plaintiffs' claim against Defendants has always been solely based on wholesale price-fixing. Thus, we proceed to determine the propriety of summary judgment for Defendants on that claim.

PROPRIETY OF SUMMARY JUDGMENT

Defendants jointly insist they are entitled to summary judgment in this case just as they were on the same claim in other jurisdictions. Two Defendants, PMI and BATCo, separately contend they are entitled to summary judgment for the additional reason that they never engaged in activities in Kansas so as to subject them to the KRTA.

In the three other cases involving this same price-fixing conspiracy, the courts found summary judgment was proper because plaintiffs failed to come forward with either direct evidence of a wholesale price-fixing conspiracy or sufficient circumstantial evidence from which a factfinder could reasonably infer such a conspiracy; that is, the circumstantial evidence upon which plaintiffs relied was inadequate to establish a reasonable inference of a price-fixing conspiracy. See *Williamson Oil Co., Inc. v. Philip*

31

*Morris USA*, 346 F.3d 1287, 1319-21 (11th Cir. 2003); *Romero v. Philip Morris Inc.*, 148 N.M. 713, 724-32, 242 P.3d 280 (2010); *Ren v. Philip Morris Companies, Inc.*, No. 00-004035-CZ, unpublished Michigan Circuit Court opinion filed September 10, 2003, Slip op. at *78. Two of the courts also concluded that even if plaintiffs had come forward with sufficient circumstantial evidence to create a rebuttable presumption of a conspiracy, the tobacco companies made a prima facie case supporting summary judgment by showing plaintiffs' theory did not make economic sense. *Williamson Oil*, 346 F.3d at 1320-21; *Romero*, 148 N.M. at 731-32.

*Surviving summary judgment in antitrust cases alleging horizontal price-fixing*

Plaintiffs respond that these other jurisdictions' decisions are inapposite because Kansas law differs, particularly with regard to what they must show to take their case to a jury. For reasons explained below, we disagree.

As already set forth at the outset of our opinion, summary judgment is appropriate under Kansas law if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. We resolve all facts and inferences that may reasonably be drawn from the evidence in favor of the nonmoving party and must deny summary judgment if reasonable minds could differ as to the conclusions drawn from the evidence. See *O'Brien v. Leegin Creative Leather Products, Inc.*, 294 Kan. 318, 330, 277 P.3d 1062 (2012) (*O'Brien I*). The question is whether these standards, alone, mandate a different result than that reached in the federal MDL and the New Mexico and Michigan state proceedings.

In assessing the propriety of the summary judgment motions filed by the tobacco companies in the other jurisdictions, each court's focus was two-fold: (1) what constitutes a reasonable inference in this antitrust context, and (2) what facts are material

32

to plaintiffs' claim of a horizontal price-fixing conspiracy. See, *e.g.*, *Romero*, 148 N.M. at 720-21.

The substantive law applied in these other cases takes into account important economic considerations that arise in antitrust cases in which claims of horizontal price-fixing in an oligopoly are supported only by circumstantial evidence of parallel pricing. There is no dispute that the tobacco industry, which involves five companies that manufacture more than 97% of cigarettes sold in the United States, is an oligopoly. See *Williamson Oil*, 346 F.3d at 1291; *Romero*, 148 N.M. at 725.

In particular, the other cases focused on the practice of competitors engaging in conscious parallelism. Kansas courts have not yet discussed this practice. But as explained by the Third Circuit in *In re Baby Food Antitrust*, 166 F.3d 112, 121-22 (3d Cir. 1999):

> "Conscious parallelism, sometimes called oligopolistic price coordination, is described as the process 'not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a prefixed maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions.' *Brooke Group v. Brown & Williamson Tobacco Corporation*, 509 U.S. 209, 227, 113 S. Ct. 2578, 125 L. Ed. 2d 168 (1993). The theory of conscious parallelism is that uniform conduct of pricing by competitors permits a court to infer the existence of a conspiracy between those competitors. [Citation omitted.] The theory is generally applied to highly concentrated markets where few sellers exist and where they establish their prices, not by express agreement, but rather in a consciously parallel fashion. [Citation omitted.] Thus, when two or more competitors in such a market act separately but in parallel fashion in their pricing decisions, this may provide probative evidence of the existence of an understanding by the competitors to fix prices. [Citation omitted.]

"In an oligopolistic market, meaning a market where there are few sellers, interdependent parallelism can be a necessary fact of life but be the result of independent pricing decisions.

> "'[I]n a market served by three large companies, each firm must know that if it reduces its price and increases its sales at the expense of its rivals, they will notice the sales loss, identify the cause, and probably respond. In short, each firm is aware of its impact upon the others. Though each may independently decide upon its own course of action, any rational decision must take into account the anticipated reaction of the other two firms. Whenever rational decision-making requires an estimate of the impact of any decision on the remaining firms and an estimate of their response, decisions are said to be "interdependent." Because of their mutual awareness, oligopolists' decisions may be interdependent although arrived at independently.'

Areeda, *Antitrust Law* § 1429 (1986). [Citation omitted.]

"Because the evidence of conscious parallelism is circumstantial in nature, courts are concerned that they do not punish unilateral, independent conduct of competitors. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). They therefore require that evidence of a defendant's parallel pricing be supplemented with 'plus factors.' [Citation omitted.] The simple term 'plus factors' refers to 'the additional facts or factors required to be proved as a prerequisite to finding that parallel action amounts to a conspiracy.' Areeda, *Antitrust Law* § 1433(e). *They are necessary conditions for the conspiracy inference*. [Citation omitted]; Areeda, § 1434. They show that the allegedly wrongful conduct of the defense was conscious and not the result of independent business decisions of the competitors. The plus factors may include, and often do, evidence demonstrating that the defendants: (1) acted contrary to their economic interests, and (2) were motivated to enter into a price fixing conspiracy. [Citation omitted.]" (Emphasis added.)

The Eleventh Circuit Court of Appeals further explained the purpose for this "summary judgment formulation . . . employed in price fixing cases" as follows:

"More frequently, price fixing plaintiffs are relegated to relying on indirect means of proof. The problem with this reliance on circumstantial evidence, however, is that such evidence is by its nature ambiguous, and necessarily requires the drawing of one or more inferences in order to substantiate claims of illegal conspiracy. Over time, courts have become attuned to the economic costs associated with using circumstantial evidence to distinguish between altogether lawful, independent, consciously parallel decision-making within an oligopoly on the one hand, and illegal, collusive price fixing on the other. *See*, *e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594, 106 S. Ct. 1348, 1360, 89 L. Ed. 2d 538 (1986) ('[M]istaken inferences in cases such as this one are especially costly, because they chill the very conduct the antitrust laws are designed to protect. "[W]e must be concerned lest a rule or precedent that authorizes a search for a particular type of undesirable pricing behavior end up by discouraging legitimate price competition."' (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763-64, 104 S. Ct. 1464, 1470, 79 L. Ed. 2d 775 (1984) and quoting *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 234 (1st Cir.1983)))." *Williamson Oil*, 346 F.3d at 1300.

With these important economic considerations in mind, the other courts that have affirmed summary judgment for the tobacco companies on a wholesale price-fixing claim brought under those jurisdictions' antitrust laws applied the following summary judgment formulation:

"'To survive a motion for summary judgment . . . a plaintiff seeking damages for [collusive price fixing based on ambiguous circumstantial evidence] . . . must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently[—*i.e.*, "plus factors"].' *Matsushita*, 475 U.S. at 588, 106 S. Ct. at 1356 (quoting *Monsanto*, 465 U.S. at 764, 104 S. Ct. at 1471)." *Williamson Oil*, 346 F.3d at 1300.

Plaintiffs complain this standard conflicts with the standards we must apply under Kansas law. Their complaint focuses in large part on the Eleventh Circuit's explanation that "the existence of 'plus factors' . . . remove [a plaintiff's] evidence from the realm of

equipoise and render that evidence more probative of conspiracy than of conscious parallelism. [Citations omitted.]" *Williamson Oil*, 346 F.3d at 1301. According to Plaintiffs, the notion that a "plus factor" must be shown to withstand summary judgment conflicts with the following principles of Kansas law:

- Summary judgment cannot lie when equal inferences arise from circumstantial evidence for and against an element of a plaintiff's cause of action.

- A court must resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom summary judgment is sought.

- Circumstantial evidence can serve as proof of the elements of a theory of liability even though other reasonable theories are not excluded by such evidence.

In a somewhat analogous situation, our Supreme Court in *O'Brien I* addressed the concept obliquely when considering evidence to support a claim of vertical price-fixing. In *O'Brien I*, the plaintiffs, a class of consumers of handbags, accessories, and luggage, contended that Brighton, the defendant manufacturer, adopted a pricing strategy that resulted in illegal price-fixing under the KRTA. The case involved claims of both horizontal and vertical price-fixing. The case was resolved in the district court by summary judgment. On appeal, our Supreme Court did not reach the question of what evidence was needed for the plaintiffs' horizontal price-fixing claim to survive summary judgment because that issue was not properly before it. 294 Kan. at 351. But the court did consider Brighton's argument on cross-appeal that it was entitled to partial summary judgment with respect to the vertical price-fixing claim, which involved merchandise sold at certain luggage and "Heart Store" retail stores because the plaintiffs failed to come forward with evidence of an agreement and concerted action between Brighton and these retailers. 294 Kan. at 355-56.

In resolving the issue, our Supreme Court first determined that an illegal "arrangement" under K.S.A. 50-112 demands "something more than merely a unilateral pricing policy adopted by a wholesale supplier in the position of Brighton." 294 Kan. at 356. The court then reasoned:

> "Because K.S.A. 50-112 and § 1 of the Sherman Act share the 'between persons' language, . . . we look to interpreting United States Supreme Court precedent for assistance in understanding *what, short of an express agreement, qualifies as more than merely unilateral behavior*. Has O'Brien mustered enough evidence to avoid summary judgment on those purchases made at Brighton retailers who were not parties to Heart Store or luggage store applications or agreements?

> "In *Monsanto*[, 465 U.S. at 763], the Court ruled that, under § 1 of the Sherman Act, a price-fixing case must include 'evidence that tends to exclude the possibility of independent action by the manufacturer and distributor.' '[T]here must be direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective[.]' . . . The Court acknowledged that evidence of complaints about discounting can be probative; however, there must be additional evidence of unlawful conduct. [Citation omitted]." (Emphasis added.) *O'Brien I*, 294 Kan. at 356-57.

After pointing out that the evidence in *O'Brien I* was "reminiscent of that before the United States Supreme Court in *Monsanto Co.*," our Supreme Court observed:

> "The Court ultimately stated in *Monsanto Co.* that it was reasonable to conclude that the termination of a noncomplying distributor was pursuant to a pricing agreement rather than unilateral pricing policy because it was 'necessary for competing distributors contemplating compliance with suggested prices to know that those who do not comply will be terminated.' [Citation omitted.] The Court decided that the plaintiff had marshaled enough evidence to raise a jury issue. [Citation omitted.]

"We reach a similar conclusion here. . . . This is not a case in which the plaintiff can show only a unilateral pricing policy or action. A genuine issue of material fact remains for trial . . . ." *O'Brien I*, 294 Kan. at 358.

Though this conclusion in *O'Brien I* was not reached in the context of a claimed horizontal price-fixing conspiracy predicated on conscious parallelism among oligopolists, we find our Supreme Court's reliance on the reasoning by the United States Supreme Court in *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984), significant. That very same reasoning underlies the summary judgment formulation developed in *Matsushita Elec. Industrial Co. v. Zenith Radio*, 475 U.S. 574, 588, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (citing *Monsanto*, 465 U.S. at 764, in concluding that to survive summary judgment, plaintiffs had to "show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed" them). In short, *O'Brien I* seems to make clear that the requirement that a plaintiff must show more than unilateral pricing activities in order to withstand summary judgment in a price-fixing case brought under the KRTA is consistent with our state standards for summary judgment.

Granted, it is settled law in Kansas that when reasonable minds can differ as to the conclusions drawn from the evidence, summary judgment is inappropriate. See *Shamberg, Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 900, 220 P.3d 333 (2009). But the antitrust cases in the *Monsanto* line make clear that reasonable minds cannot infer that price-fixing is afoot merely from conscious parallel pricing conduct of oligopolists. Something more must be shown to establish a *reasonable* inference that such competitors acted in concert. Reasonable minds could not draw a reasonable inference of price-fixing from evidence of conscious parallel pricing in an oligopolistic market with nothing more. As noted earlier in the court's discussion of conscious parallelism in *In re Baby Food Antitrust*, in a market served by a few large firms,

"'each firm must know that if it reduces its price and increases its sales at the expense of its rivals, they will notice the sales loss, identify the cause, and probably respond. In short, each firm is aware of its impact upon the others. Though each may independently decide upon its own course of action, any rational decision must take into account the anticipated reaction of the other[s] . . . . Because of their mutual awareness,' their 'decisions may be interdependent although arrived at independently.' (6 Areeda, Antitrust Law [1986] ¶ 1429a, p. 175.) In such a market . . . prices may move generally upward across all of the firms more or less together, rising quickly and falling slowly, and may do so interdependently but nevertheless independently. (See [6 Areeda, Antitrust Law] ¶ 1429b, pp. 175-177.) For collusion, there must be more than interdependence." *Aguilar v. Atlantic Richfield Co.*, 25 Cal. 4th 826, 864, 107 Cal. Rptr. 2d 841, 24 P.3d 493 (2001).

This is when evidence of a "plus factor" comes into play. As noted in *Williamson Oil*, 346 F.3d at 1310, courts need to

"exercise prudence in labeling a given action as being contrary to the actor's economic interests, lest we be too quick to second-guess well-intentioned business judgments of all kinds. [Citation omitted.] Accordingly, [plaintiffs alleging illegal price-fixing in an oligopolistic market] must show more than that a particular action did not ultimately work to a manufacturer's financial advantage. Instead . . . the action must 'tend[] to exclude the possibility of independent action.' Thus, if a benign explanation for the action is equally or more plausible than a collusive explanation, the action cannot constitute a plus factor."

We do not find the requirement of a "plus factor" to be inconsistent with Kansas law. As the federal courts have consistently explained, this standard for surviving summary judgment in an antitrust price-fixing case based on circumstantial evidence does not "introduce a special burden on plaintiffs facing summary judgment in antitrust cases." *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 468, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992). Rather, "*Matsushita* demands only that the nonmoving party's inferences be reasonable in order to reach the jury, a requirement that was not invented, but merely articulated, in that decision." *Eastman Kodak*, 504 U.S. at

39

468; see *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 95 (2d Cir. 1998) (citing *Matsushita*, 475 U.S. at 588, in explaining that "[a]lthough all reasonable inferences are drawn in the nonmovant's favor, in an antitrust case, those inferences must be reasonable in light of competing inferences of acceptable conduct"); *Aguilar*, 25 Cal. 4th at 857 (recognizing in this context that inference of unlawful conspiracy required by *Matsushita* "is reasonable if, and only if, it implies unlawful conspiracy *more likely than* permissible competition). In sum, the "plus factor" standard is simply *an articulation* of the requirement that an inference drawn from the plaintiff's circumstantial evidence offered to establish collusive pricing must be reasonable. As also stated in *Williamson Oil*, 346 F.3d at 1303, "[t]he 'tends to exclude . . .' standard articulated in *Matsushita* . . . simply represents an explication of [the reasonable inference] requirement; it does not represent a new hurdle. In other words, evidence creates the requisite reasonable inference of conspiracy if it 'tends to exclude the possibility that the alleged conspirators acted independently.'"

We see no sound reason to stray from this accepted body of caselaw and economic analysis by declaring conscious parallelism with nothing more to be illegal under the KRTA. Without evidence of some plus factor that tends to establish Defendants' pricing policies were the product of an illegal price-fixing conspiracy in violation of the KRTA, a jury could not reasonably find for Plaintiffs.

Thus, we conclude that to establish a material question of fact and thereby survive summary judgment, Plaintiffs must come forward with evidence that Defendants' wholesale pricing practices resulted from something more than legal conscious parallelism. This conclusion is based on the notion that in requiring something more than unilateral behavior, the KRTA does not reject what we perceive to be an economic proposition which has been universally applied in cases around the country:  that conscious parallelism in pricing products in an oligopoly market is not sufficient, in and of itself, to establish illegal conduct. If this is so, then it is incumbent upon Plaintiffs to

40

present further evidence that tends to establish that synchronous conduct of Defendants is the product of an illegal conspiracy. Otherwise, why would one ever send to trial a case in which there is no evidence that, to a reasonable juror, tends to establish illegal conduct?

*Plus factors*

What evidence can constitute a plus factor in the context of Plaintiffs' claim here? While there are no bright-line rules to guide this query, the federal courts have offered some guidance on what may or may not be enough to constitute a plus factor. For example, in *Williamson Oil* the court stressed that "if a benign explanation for the [defendants'] action is equally or more plausible than a collusive explanation, the action cannot constitute a plus factor." 346 F.3d at 1310. Further, evidence that would require the jury to "engage in speculation and conjecture to such a degree as to render its finding 'a guess or mere possibility'" does not constitute a plus factor. *Holiday Wholesale Grocery v. Philip Morris Inc.*, 231 F. Supp. 2d 1253, 1271 (N.D. Ga. 2002), *aff'd sub nom. Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003). On the other hand, "'a showing that the defendants' behavior would not be reasonable or explicable (*i.e.* not in their legitimate economic self-interest) if they were not conspiring to fix prices or otherwise restrain trade[]' [citation omitted]" can constitute a plus factor. *Williamson Oil*, 346 F.3d at 1301. In other words, "any showing by [a plaintiff] that 'tend[s] to exclude the possibility of independent action' can qualify as a 'plus factor.'" 346 F.3d at 1301 (quoting *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 571 n.35 [11th Cir. 1998]); see Shulman, *Proof of Conspiracy in Antitrust Cases & the Oligopoly Problem*, 4 Sedona Conf. J. 1, 12-13 (Fall 2003) (setting forth list that "synthesizes [plus] factors that have received mention in cases and in law review articles").

Regardless, to be a viable plus factor, a plaintiff's showing must make economic sense to a reasonable jury. *Eastman Kodak*, 504 U.S. at 468-69. Thus, while it is not the role of a court to substitute itself for the factfinder in examining claimed plus factors at the summary judgment stage, the court must determine the "reasonableness of the inferences that c[an] be drawn from the evidence, [which are] threshold legal determinations that appropriately [are] made by the district court." *Williamson Oil*, 346 F.3d at 1304.

With these standards in mind, we turn to consider the evidence of plus factors offered by Plaintiffs in this case. Because we have concluded that Plaintiffs' claim is for wholesale price-fixing and not separate claims for artificially propping up demand by conspiring on health issues and artificially suppressing supply by engaging in price-fixing in foreign markets, we will examine these two theories to determine whether either constitutes a plus factor from which a reasonable juror could conclude that Defendants' parallel pricing was the product of an illegal conspiracy to fix prices. Other claimed plus factors summarily enumerated in Plaintiffs' appellate brief are as follows:

• Structure of the market with few competitors;

• Meetings or communications involving high-level executives that present an opportunity to conspire or a high degree of interfirm communications;

• Extensive information exchanges or the reciprocal exchange of price information;

• History of collusion in the industry or among Defendants and ongoing conspiracies for the same or similar products;

• Acting contrary to independent self-interest;

• Changing an established business practice that has been followed over a prolonged period of time; and

• Giving pretextual reasons for actions.

As evidence for each, Plaintiffs cite broadly to six volumes of the record containing their experts' reports. We will consider each asserted plus factor in turn.

*Structure of the Market*:  As support for their contention that the structure of the oligopolistic cigarette market is evidence of a plus factor, Plaintiffs direct us to *In re Flat Glass Antitrust Litigation*, 385 F.3d 350 (3d Cir. 2004), in which the court relied on the holding in *In re High Fructose Corn Syrup Antitrust Lit.*, 295 F.3d 651, 655 (7th Cir. 2002). We assume Plaintiffs are referring to those courts' recognition that "'evidence that the structure of the market was such as to make secret price fixing feasible'" can support the plus factor of an existing motive by a defendant to enter into a price-fixing conspiracy. *Flat Glass*, 385 F.3d at 360 (quoting *High Fructose*, 295 F.3d at 655). Notably, however, both courts went on to recognize that this same factor "largely restate[s] the phenomenon of interdependence," so it "may not suffice—by [itself]—to defeat summary judgment on a claim of horizontal price-fixing among oligopolists." *Flat Glass*, 385 F.3d at 360-61; see *High Fructose*, 295 F.3d at 655. Consequently, the court observed in *Flat Glass*, "this type of economic evidence is neither necessary nor sufficient to conclude that sufficient proof of an agreement exists to preclude summary judgment, but it is relevant and courts should as a general matter consider it." 385 F.3d at 361 n.12.

So we will consider the evidence Plaintiffs offer in this regard. In a report that Plaintiffs submitted with their response to Defendants' motions for summary judgment, Plaintiffs' expert economist, Dr. Keith Leffler, made several general observations concerning the oligopolistic nature of the cigarette market. For example, Dr. Leffler

opined: The cigarette market is "highly concentrated and conducive to successful collusive pricing." "Five companies dominated cigarette production in the U.S., and three of them 'account for about 90% of the market.'" Participants in the market face "very high" entry barriers. Thus, as reported by the Federal Trade Commission, the "'entry of additional firms into the market (or its prospect) is unlikely to upset the stability of a coordinated pricing strategy.'" Further, new entrants would be entering a cigarette market with declining demand and would face existing participants with "substantial excess capacity." Additionally, Dr. Leffler observed that "the demand for cigarettes is highly inelastic," meaning "consumers are not sensitive to cigarette prices" in making a buying decision and "there are no effective substitutes for cigarettes."

This same or similar plus factor was rejected in the federal MDL proceedings. There, the Eleventh Circuit noted the tobacco industry "features a concentration of sellers, inelastic demand at competitive prices, high barriers to entry, a fungible product, principal firms selling at the same level in the chain of distribution, prices that can be changed quickly, [and] cooperative practices." *Williamson Oil*, 346 F.3d at 1296. The court concluded that the structure of the market did not constitute a plus factor because "the majority of the market characteristics on which the class focuses are simply indicia that the tobacco industry is an oligopoly, which is perfectly legal." 346 F.3d at 1317.

Dr. Leffler also served as the plaintiffs' expert in the parallel litigation in New Mexico in *Romero v. Philip Morris Inc.*, 148 N.M. 713, 242 P.3d 280 (2010). There, the plaintiffs also alleged a plus factor based on the structure of the market, focusing primarily on "a highly concentrated market, cigarette fungibility, high barriers to entry in the industry, absence of close substitutes, and a history of collusion." 148 N.M. at 729. The New Mexico Supreme Court observed that a majority of these factors "are nothing more than inherent characteristics of an oligopoly and cannot tend to exclude independent action." 148 N.M. at 729.

44

We agree with the reasoning of these courts and reject the structure of the cigarette market as a viable plus factor here. A plus factor must be something that tips the scales from otherwise legal synchronous conduct among competitors in an oligopoly to a price-fixing conspiracy condemned by our antitrust laws. Conscious parallelism, which is lawful conduct, arises in markets containing these very factors which define an oligopoly. Thus, these factors, which describe market characteristics for legal conscious parallelism, cannot tip the evidentiary scale out of equipoise so as to provide evidence from which a reasonable factfinder could infer illegal conduct.

*Meetings of High-Level Executives; Interfirm Communications*:  The next plus factor summarily cited by Plaintiffs in their brief is "[m]eetings and/or communications of high-level executives presenting an opportunity to conspire and/or high degree of interfirm communications." As support, Plaintiffs cite two unpublished opinions without attaching copies of those opinions or offering any explanation for why they support this proposition. See Supreme Court Rule 7.04(g)(2)(C) (2013 Kan. Ct. R. Annot. 59) (requiring copy of unpublished opinion to be attached to any document that cites it). In short, Plaintiffs appear to suggest a jury could reasonably infer that Defendants conspired to fix prices from the mere fact that they had numerous opportunities to do so.

This plus factor was also rejected in the federal MDL. The Eleventh Circuit noted that "the opportunity to fix prices without any showing that [the defendant tobacco companies] *actually* conspired does not tend to exclude the possibility that they did not avail themselves of such opportunity or, conversely, that they actually did conspire." *Williamson Oil*, 346 F. 3d at 1319.

The court in *Romero* also rejected this plus factor. That court concluded that "the fact that Defendants may have met does not reasonably lead to the inference that they conspired to discuss price fixing. '[M]ere contacts and communications, or the mere opportunity to conspire, among antitrust defendants is insufficient evidence from which

45

to infer an anticompetitive conspiracy . . . .' [Citations omitted.]" 148 N.M. at 730-31; see *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1575 (11th Cir. 1991) (same); *Bolt v. Halifax Hosp. Medical Center*, 891 F.2d 810, 827 (11th Cir. 1990) (same).

We see no reason not to reject Plaintiffs' identical contention here for these same reasons.

*Reciprocal Exchange of Price Information*:  Plaintiffs suggest that Defendants' exchange of pricing information is evidence that tends to exclude independent conduct. Some additional factual background is required to provide context for this contention.

Plaintiffs' summary contention here relates to the undisputed fact that Manufacturing Defendants exchanged shipment-to-wholesale cigarette volume data through a common consultant, Management Science Associates (MSA). In their joint statement of uncontroverted facts, Manufacturing Defendants stated that "participants in [their] respective wholesaler incentive programs compiled and reported to MSA information regarding the volume of their shipments to retailers." Defendants further stated that it was uncontroverted that "[p]articipants in [their] respective wholesaler incentive programs were not asked to provide, and as a function of their participation did not provide, [Manufacturing] Defendants or MSA with any information regarding pricing or discounts."

In their response, Plaintiffs contended these facts were controverted because the exchange of sales data served as a "means of facilitating the monitoring of the conspiracy by all of the conspirators." But we note that in responding to requests for admissions on this issue, when discussing Defendants' use of MSA, Plaintiffs referred to the discussion in *Williamson Oil* on whether the exchange of sales data evidenced conduct to facilitate an illegal conspiracy or the lawful use of MSA to shift "the financial burden of gathering sales and market share data." 346 F.3d at 1313. Plaintiffs quoted *Williamson Oil* as

46

follows: "[B]oth explanations are plausible, and thus, at the most, this action by PM stands in equipoise; that is, it is equally consistent with collusion as with lawful competition, and accordingly, under *Matsushita* and *Harcros*, it cannot represent a plus factor." *Williamson Oil*, 346 F.3d at 1313.

Competitors are entitled to collect and use information about their competitors in conducting their business, and consideration of competitors' prices is an important component of a pricing decision. See *Wallace v. Bank of Bartlett*, 55 F.3d 1166, 1169 (6th Cir. 1995), *cert. denied* 516 U.S. 1047 (1996); *Aguilar*, 25 Cal. 4th at 862-63. As Plaintiffs have apparently conceded, the use of MSA as a vehicle for exchanging information on sales volumes does not constitute a plus factor which assists the factfinder in its determination of whether Defendants' synchronous pricing was the product of an illegal conspiracy. Thus, Plaintiffs have not established how this exchange of information tends to exclude the possibility of independent pricing decisions.

*History of Collusion; Ongoing Conspiracies for Same or Similar Product*:  The next plus factor advanced by Plaintiffs concerns the Defendants' history of collusion, which they suggest "includes ongoing conspiracies for the same or similar product." As support for this contention, Plaintiffs summarily cite to two treatises:  Shulman, *Proof of Conspiracy in Antitrust Cases & the Oligopoly Problem*, 4 Sedona Conf. J. at 9; and Posner, Antitrust Law 79 (2d ed. 2001). They also cite generally to *Continental Co. v. Union Carbide*, 370 U.S. 690, 699, 82 S. Ct. 1404, 8 L. Ed. 2d 777 (1962). Without more analysis, we can only presume that in doing so, Plaintiffs are likely referring us to the general recognition in that case that "'the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole. [Citation omitted.]'" 370 U.S. at 699. We further surmise that the "[h]istory of collusion" generally referred to by Plaintiffs is tied largely to some of the same defendants' violations of the Sherman Act as discussed in *American Tobacco Co. v.*

47

*United States*, 328 U.S. 781, 66 S. Ct. 1125, 90 L. Ed. 1575 (1946), which we will discuss below.

This same plus factor was raised and rejected in both the federal MDL and the New Mexico case. Both courts noted that the plaintiffs in those cases failed to explain how an antitrust case from 50 years ago tended to exclude the possibility that Defendants' current pricing activities were the product of independent action. See *Williamson Oil*, 346 F.3d at 1317-18; *Romero*, 148 N.M. at 730.

From our review of Dr. Leffler's report, it does not appear that Plaintiffs' contention concerning the history of collusion has changed in this case. In his report, Dr. Leffler first directs us to the 1911 breakup of American Tobacco Company which resulted in 14 successor companies, including Liggett, Lorillard, RJR, and BATCo. See *United States v. American Tobacco Co.*, 221 U.S. 106, 184-88, 31 S. Ct. 632, 55 L. Ed. 663 (1911); see also *United States v. American Tobacco Co.*, 164 F.3d 700, 1024-25 (S.D.N.Y. 1908) (setting forth resulting dissolution decree). According to Dr. Leffler, "[t]he absence of vigorous price competition in the industry goes back to the turn of the century when the government 'dissolved' the Tobacco Trust by creating a highly concentrated industry run by the same executives that before explicitly acted to monopolize the industry." Of course, the antitrust violation that led to that early governmental action was not a conspiracy among competitors in violation of § 1 of the Sherman Act but rather the unlawful exercise of monopoly power in violation of § 2 of the Act.

In 1944 American Tobacco, Liggett, and RJR were convicted of conspiracy in restraint of trade by price-fixing and other means. They were also convicted of a conspiracy to monopolize trade. *American Tobacco Co. v. United States*, 147 F.2d 93, 99, 120 (6th Cir. 1944), *aff'd* 328 U.S. 781, 784, 66 S. Ct. 1125, 90 L. Ed. 1575 (1946) (deciding limited question of whether actual exclusion of competitors is necessary to

48

crime of monopolization, which was one of four counts of which these defendants were convicted).

In the Eleventh Circuit's opinion in the MDL, the court noted that Plaintiffs "failed to direct [the district court] to any precedent for holding such to be indicative of a present antitrust violation" and "failed to do so on appeal as well." *Williamson Oil*, 346 F.3d at 1318; see *Holiday Wholesale Grocery*, 231 F. Supp. 2d at 1305 (recognizing "[t]he law generally disfavors use of such 'historical' evidence. [Citations omitted.]" Similarly, the New Mexico Supreme Court in *Romero*, commenting on the 1944 Sherman Act violation found in *American Tobacco Co.*, 147 F.2d 93, observed: "Plaintiffs do not explain how a case from more than fifty years ago is indicative of a present day price-fixing agreement, especially when only one of the current Defendants, RJR, was a defendant in [that] case." *Romero*, 148 N.M. at 730.

We also note that at about the same time the conspiracy in the present case allegedly began, the United States Supreme Court stated in *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 213, 113 S. Ct. 2578, 125 L. Ed. 2d 168 (1993): "Substantial evidence suggests that in recent decades, the industry reaped the benefits of prices above a competitive level, though not through unlawful conduct of the type that once characterized the industry."

Plaintiffs contend the lock-step price moves of Defendants following Marlboro Friday in 1993 were the product of an illegal price-fixing conspiracy. Yet the 1980's and 1990's marked a period of intense wholesale price competition in the tobacco industry as evidenced by the findings in *Brooke* and in *R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 380-86 (M.D.N.C. 2002). We conclude that a reasonable factfinder would not reach back beyond this current period marked by competition to a time many decades earlier, when two of the numerous defendants in this case were found guilty under the Sherman Act, and infer from such a remote fact that all Defendants here

49

were engaged in a price-fixing conspiracy in 1993. Thus, we do not find the claimed history of collusion to be a viable plus factor.

*Acting Contrary to Independent Self-Interest*:  Plaintiffs contend that Defendants' wholesale pricing activities were contrary to their independent self-interests. On this point Dr. Leffler analyzed how RJR, followed by the other Manufacturing Defendants, reacted to Marlboro Friday. Dr. Leffler opined that rather than continuing to focus on maintaining or increasing the gap between discount and premium brands, which would have been in their economic self-interests, those Defendants gave into or aided PM-USA's consolidation of the pricing structure of cigarettes, in turn "mak[ing] collusive pricing easier and . . . thereby facilitat[ing] the alleged conspiracy." Dr. Leffler likewise opined that PM-USA's decision to cut prices was economically rational "[o]nly in [e]xpectation of [f]uture [p]rice increases" by means of, in part, the elimination of competition from the discount sector. Dr. Leffler offered at least three separate conclusions in this regard:  (1) "The economic evidence indicates that it is highly unlikely that independent competitive behavior explains the reestablishment and maintenance of high cigarette[] prices after November 1993." (2) "The economic evidence indicates that the price increases for cigarettes after November 1993 were *consistent with* effective collusion among the cigarette producers." (Emphasis added.) (3) "The changes in market shares in the industry after November 1993 are *consistent with* an effective conspiracy to maintain the high average prices of cigarettes by substantially eliminating price competition between premium and discount cigarettes." (Emphasis added.)

There is no dispute that evidence of actions contrary to economic self-interest can serve as a plus factor. *Williamson Oil*, 346 F.3d at 1310. But as the Eleventh Circuit observed, courts necessarily "must exercise prudence in labeling a given action as being contrary to the actor's economic interests, lest we be too quick to second-guess well-intentioned business judgments of all kinds." 346 F.3d at 1310. Thus, to establish this plus factor, it is not enough for a plaintiff to show that a particular action did not, in

50

hindsight, ultimately work to a defendant's financial advantage. Nor is it enough to say something other than self-interest might have motivated the pricing decision. Rather, "in the terms employed by *Matsushita*, the action must 'tend[] to exclude the possibility of independent action.' Thus, if a benign explanation for the action is equally or more plausible than a collusive explanation, the action cannot constitute a plus factor." *Williamson Oil*, 346 F.3d at 1310.

Here, as we understand was also the case in the federal MDL, Plaintiffs' expert questioned the economic sensibility of (1) the noninitiating Defendants following price increases, (2) Defendants involved in the discount segment of the market deciding not to continue to develop that market, (3) Defendants exchanging information through the MSA, and (4) Defendants making payment and market-allocation decisions as part of the settlements of certain tort cases in 1997. See 346 F.3d at 1310.

But the undisputed facts set forth by Defendants demonstrate that these actions were just as likely to be the result of independent decisions made in the economic interests of the individual Defendants. For example, Defendants heavily involved in the discount segment of the market learned from PM-USA's aggressive and unambiguous message that any further attempts by them to maintain or continue their attempts to widen the premium-discount price gap was not likely to lead to increased market gains or profits. Rather, Manufacturing Defendants' "only viable route back to profitability was to increase prices; that they did so in a parallel manner does not establish collusion." 346 F.3d at 1311.

In short, while Plaintiffs in this case did come forward with expert opinions of possible collusive purposes for Defendants' pricing decisions, as was the case in the MDL, they did not come forward with evidence that tends to show those decisions were the result of collusion as opposed to independent and legal self-interested business

51

judgments. This is not enough to establish a plus factor sufficient to survive summary judgment in a price-fixing claim involving competitors in an oligopoly.

*Giving Pretextual Reasons for Actions*:  While Plaintiffs list this as a plus factor, they do not explain the "pretextual reasons" upon which they rely or how any such reasons tend to establish that Defendants' synchronous pricing was a product of an illegal conspiracy rather than lawful conscious parallelism.

The only discussion we find to be possibly tied to this factor appears in the expert opinion of Dr. Jeffrey Harris. Dr. Harris opined that Defendants' public denials of the health hazards of smoking and the private acknowledgment of the dangers of smoking "points to a collusive arrangement." According to Dr. Harris, "any single company's denial of causation would likely lose credibility if the other oligopolistic cigarette manufacturers admitted that smoking causes disease. Thus, the strategic decision to deny that smoking causes disease benefits any individual oligopolist only if the others act cooperatively to deny causation as well." Dr. Harris also opined:

> "A principal motive for manufacturers' joint denial that smoking causes disease is to bolster cigarette consumption and thus raise industry profits. However, there were other industry-wide benefits of joint denial. Starting in the early 1950's, individual smokers began to bring lawsuits against companies. Uniform denial that smoking caused disease would help to insulate all defendant manufacturers from adverse judgments in such smokers' lawsuits. However, if one company made an admission that smoking caused disease, such an admission could hurt the others' chances of a successful defense in court."

We find no other possible evidence relating to this claimed plus factor. Because this evidence relates to the claim that Defendants' conspiracy to keep hidden the adverse health effects of smoking constitutes a plus factor, we will address this claim in that context.

52

*Foreign Price-Fixing Conspiracy*:  Plaintiffs argue Defendants conspired to fix the prices of cigarettes in foreign countries, which, in turn, drove up cigarette prices in the United States. Plaintiffs contend this is because the foreign price-fixing diverted cigarettes from the domestic market, resulting in a decreased domestic supply of cigarettes which artificially propped up domestic wholesale prices. Plaintiffs contend this foreign price-fixing scheme constitutes a plus factor that supports the notion that Defendants' conscious parallelism in establishing their wholesale cigarette prices was not merely the natural and wholly legal interdependent but independent pricing practices that occur in an oligopoly, but rather it was the product of an illegal agreement to fix the domestic wholesale price of cigarettes.

Plaintiffs rely on the expert opinion of Dr. Leffler. According to Dr. Leffler, Defendants conspired to fix the prices of cigarettes outside the United States, including in "Canada, Europe, and numerous Latin American countries." He contends that foreign conspiracies encourage suppliers to export cigarettes to the more lucrative foreign markets. Then, "as cigarettes are sent out of the United States, reducing U.S. supply, the prices in the United States are expected to increase."

Of course, an "expected" price increase does not establish that any foreign price-fixing activities had an *actual* adverse impact on domestic cigarette prices. This is particularly so in light of Dr. Leffler's observation:  "The market for the cigarettes has been declining since the 1980s, resulting in substantial excess capacity by the incumbent firms." See also *Brooke Group*, 509 U.S. at 214.

According to the Federal Trade Commission, domestic cigarette sales for the period 1990 to 1999 declined from 524 billion cigarettes to 411 billion cigarettes. *R.J. Reynolds*, 199 F. Supp. 2d at 367 n.3. At least one federal court has recognized as a result that RJR, Lorillard, and B&W "possess[ed] substantial excess capacity that would enable them to expand supply in order to meet any unsatisfied market demand." 199 F. Supp. 2d

at 384. These market circumstances "tend to break down patterns of [unlawful] pricing and produce price competition." *Brooke Group*, 509 U.S. at 238.

We find it significant that neither Plaintiffs nor any of their experts have directed us to any evidence (or something more than equivocal hypotheses) that any diversion of cigarettes to foreign markets to meet the demands of a conspiracy there was not made up for by additional domestic cigarette production.

Here, Dr. Leffler's opinion goes beyond this supply/demand argument to posit that the foreign price-fixing "agreements in other markets aid in establishing and maintaining industry cooperation necessary for successful collusion." As we understand it, Dr. Leffler's contention is that when competitors collude in several foreign markets, if one conspirator "jumps ship" in one particular market, that conspirator's position in another market where the conspirators' enjoy inflated prices may be placed in jeopardy.

Further, and rather curiously, Dr. Leffler contends that the existence of a domestic price-fixing conspiracy promotes the success of the foreign price-fixing conspiracy by discouraging domestic suppliers not party to the foreign conspiracy from entering the foreign market and undercutting the fixed price. This theory, of course, provides no support for the notion that the claimed foreign price-fixing conspiracy provides evidence from which one can infer an agreement to fix prices in Kansas. Domestic conduct that is alleged to have furthered a conspiracy to fix prices in some foreign market is not relevant in this case.

In the federal MDL case, the defendants contended that their pricing agreements in foreign markets were consistent with local law. The Eleventh Circuit rejected the contention that evidence of foreign price-fixing conspiracies constituted a viable plus factor to support the proposition that the defendants' parallel pricing in the United States was the product of an illegal conspiracy. The Eleventh Circuit reasoned that the plaintiffs

54

failed to produce any evidence of any "palpable tie" between the tobacco companies' overseas activities and pricing actions in the United States. *Williamson Oil*, 346 F.3d at 1317. The court further reasoned that any such evidence would not establish a prior wrongful act when the plaintiffs had not shown that the tobacco companies' actions were unlawful under foreign law. 346 F.3d at 1317.

Likewise, in our present case Plaintiffs have not established that any alleged price-fixing activities by Defendants that underlie their allegations here were, in fact, unlawful under foreign law. Nor have plaintiffs produced any evidence of any "palpable tie" between the tobacco companies' overseas activities and the pricing actions in the United States that underlie the price-fixing claim in this case. To the contrary, Plaintiffs' own expert (Dr. Leffler) recognized market circumstances that would suggest the contrary. In sum, even if we were to accept as true Plaintiffs' contentions that a foreign price-fixing conspiracy was afoot, Plaintiffs have not come forward with evidence to show such a conspiracy tends to establish Defendants' domestic wholesale pricing was the product of an unlawful conspiracy. Rather, they have given us only speculative economic theory that simply is not enough to survive summary judgment on a horizontal price-fixing claim against an oligopoly.

*Smoking and Health Conspiracy*:  Plaintiffs' claim regarding a smoking and health conspiracy mirrors the claim raised in the federal MDL. See *Williamson Oil*, 346 F.3d at 1315-16. Accordingly, a detailed discussion of the Eleventh Circuit's treatment of that plus factor is in order at the outset of our consideration of this plus factor.

The plaintiffs in *Williamson Oil* alleged that the tobacco companies "conspired during the 1950s to refrain from seeking any competitive advantage by developing more health-conscious tobacco products or by competing on the basis of health generally." 346 F.3d at 1296. According to the plaintiffs, this health conspiracy remained effective during the price-fixing conspiracy period in *Williamson Oil* (which essentially mirrors the

55

"[c]lass [p]eriod" in our case) and "evidence[d] [the defendants'] agreement to fix prices." 346 F.3d at 1315. But Professor Franklin Fisher, the plaintiffs' expert in *Williamson Oil*, cited no conduct in furtherance of this health conspiracy during the period of the price-fixing conspiracy. Rather, he opined that it was "'entirely *possible* that [the tobacco companies'] decisions to limit health-based marketing in the past continued to be felt between 1993 and 2000. Such decisions *may* have checked companies' incentives to vigorously pursue health-related research.'" 346 F.3d at 1316 (quoting *Holiday Wholesale Grocery*, 231 F. Supp. 2d at 1311).

The Eleventh Circuit held this evidence was too speculative to constitute a plus factor. *Williamson Oil*, 346 F.3d at 1316. As support, the court cited *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 468-69, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992), for the proposition that "evidence of predatory pricing that is '"speculative" and [is] not "reasonable"' is insufficient to withstand an antitrust defendant's summary judgment motion" before concluding that an inference of misconduct cannot arise from mere speculation, which was all that the plaintiffs had brought before the court. *Williamson Oil*, 346 F.3d at 1316.

In our present case, and contrary to the situation in *Williamson Oil*, Plaintiffs cite conduct during the period of the alleged price-fixing conspiracy in which tobacco company executives, in furtherance of the health conspiracy, testified before Congress in 1994 that cigarette smoking is not addictive and the presence of nicotine does not make it so. According to Dr. Harris, this health conspiracy began to unravel in the late 1990's and then ended "[w]ithin a 15-day period in June 2000, [when] all of the major cigarette manufacturers—[PM-USA, RJR,] and Lorillard, as well as [B&W]—made an abrupt about-face and admitted that smoking causes disease."

The court in *Williamson Oil* found the plaintiffs' evidence of a health conspiracy could not constitute a plus factor because

56

"[i]n essence, for a jury to infer from this evidence that appellees collusively fixed prices during the 1990s, it would have to engage in propensity reasoning, *i.e.*, 'they did it 40 years before so they probably did it again,' albeit now with Lorillard on board and with the object of the conspiracy being prices as opposed to health." 346 F.3d at 1316.

Similarly, under our rules of evidence, specifically K.S.A. 2013 Supp. 60-455, evidence of this health conspiracy may not be admitted "as the basis for an inference that [Defendants] committed another crime or civil wrong on another specified occasion." But such evidence may be admitted "when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." K.S.A. 2013 Supp. 60-455. Further, this is not an exclusive list. "[T]hese eight are *among* the possibilities, not the *only* possibilities." *State v. Gunby*, 282 Kan. 39, 53, 144 P.3d 647 (2006). To be admitted under K.S.A. 2013 Supp. 60-455, the evidence must be relevant. K.S.A. 60-401(b) defines relevant evidence as "evidence having any tendency in reason to prove any material fact."

The district court opinion in the *RICO* case demonstrates ample—in fact, overwhelming—evidence of a conspiracy to hide from the public the deleterious effects of smoking. There is also evidence to support the argument that this conduct had the effect of artificially maintaining the demand for cigarettes at a level higher than would have been the case (at least for some period of time) had the public known and understood the dangers of smoking. The court held the defendants violated RICO by marketing and selling "their lethal product with zeal, with deception, with a single-minded focus on their financial success, and without regard for the human tragedy or social costs that success exacted." *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 28 (D.D.C. 2006), *aff'd in part and vacated in part by* 566 F.3d 1095 (D.C. Cir. 2009), *cert. denied* 130 S. Ct. 3502, *reh. denied* 131 S. Ct. 57 (2010). The court determined that defendants' nonprice agreements "were calculated to serve their shared

objectives, including their primary goal of maximizing profits by preserving and expanding the market for cigarettes." 449 F. Supp. 2d at 872.

In our present case, Dr. Leffler stated:

"By suppressing competition on health related product differentiation, defendants would directly impact the price of cigarettes. As consumers became more aware of the health risks of smoking, demand for cigarettes would be reduced and price would fall. By collusively controlling the industry reaction to the emerging literature on the health impacts of smoking and by controlling efforts to produce a safer cigarette the industry would directly impact the prices paid for cigarettes by Kansas consumers."

Dr. Harris expressed similar views. Another expert for Plaintiffs, Dr. Aju J. Fenn opined:

"Cigarette demand with no information or misleading information about addiction will be higher than the demand for cigarettes of a fully informed consumer. Consumer[s] who start consuming cigarettes without the explicit knowledge that they are addictive falsely believe that they have a choice to stop consuming the product at any time. They are unaware that their current actions are committing them to future purchases of cigarettes. If properly informed about the addictive nature of cigarettes, coupled with the information of the adverse health effects of smoking many of these consumers would choose not to smoke. This is clearly evident from the drops in cigarette consumption during the years that the Surgeon General's warnings were issued. However, these health warnings lose their effectiveness over time given the barrage of misleading information and the constant stream of denials about the adverse health effects and addictive nature of cigarettes by the defendants."

But the question for us is whether the existence of such a conspiracy constitutes circumstantial evidence which tends to prove to a reasonable person that the synchronous wholesale pricing of cigarettes in this oligopoly market was the product of an illegal agreement to fix prices rather than legal conscious parallelism. In other words, does evidence of the existence of this health conspiracy, which had the effect of artificially

58

maintaining demand for tobacco products, tend to prove that Defendants entered into a separate conspiracy to fix the wholesale prices for cigarettes sold in Kansas?

There must be a rational connection between the evidence of the health conspiracy and the contention that Defendants entered into a separate price-fixing conspiracy. Plaintiffs allege the health conspiracy began in December 1953. This conspiracy apparently ended in June 2000 when the tobacco manufacturers admitted the health risks associated with smoking. Plaintiffs contend this conspiracy was effective in propping up demand for cigarettes and enhancing the profitability of the tobacco industry. In the meantime, the price-fixing conspiracy at issue here is alleged to have begun in November 1993, after the health conspiracy had been in operation for 40 years. We find no evidence that would explain why, in the midst of an apparently successful health conspiracy, Defendants would overlay that conspiracy with a separate price-fixing conspiracy.

Further, unlike the profitable health conspiracy, the price-fixing conspiracy the Defendants are accused of entering into was one during which cigarette prices were lower than they had been before the claimed conspiracy began. Cigarette prices ultimately increased during the claimed conspiracy at a rate lower than before. The claimed coconspirators spent far more competing with one another (over $25 billion) than the amount of the overcharge in wholesale prices ($11.9 billion) claimed in the MDL. The level of competition led RJR and B&W to sue Philip Morris for antitrust violations in the midst of the alleged conspiracy.

The tobacco manufacturers apparently hung together to the bitter end in carrying out the health conspiracy. Yet in the price-fixing conspiracy that allegedly arose after 40 years of hiding the facts about the health effects of tobacco, competition among the claimed coconspirators resulted in dramatic shifts in market share, rendering some of them winners and others clear losers. All of this leads us to conclude that the existence of the health conspiracy does not have a tendency in reason to prove that Defendants also

59

engaged in the alleged price-fixing conspiracy. The health conspiracy does not constitute a plus factor.

Taken individually or collectively, the structure of the market, the meetings between tobacco company executives, the exchange of sales information, the history of past misconduct, the actions claimed to be contrary to the actors' independent self-interest, the claimed pretextual reasons for actions, the foreign price-fixing claim, and the health conspiracy do not constitute evidence that tends to exclude the possibility that Defendants were engaged in lawful conscious parallelism in their pricing decisions. With that, we conclude the district court did not err in granting summary judgment to Defendants.

In light of this holding, we need not consider Plaintiffs' challenge to the district court's alternative basis for granting summary judgment in favor of Defendants PMI and BATCo based upon the lack of evidence that they sold product in Kansas. Even if we were to agree with Plaintiffs' criticism of the district court's ruling regarding PMI and BATCo, they would still be entitled to summary judgment on Plaintiffs' wholesale price-fixing claim for the same reasons as the other Defendants.

DENIAL OF PLAINTIFFS' MOTION TO FILE SECOND AMENDED PETITION

Plaintiffs also contend that even if we do not reverse the summary judgment entered in Defendants' favor, we should find error in the district court's denial of their motion for leave to file a second amended petition.

*Standard of review*

We review the district court's denial of Plaintiffs' motion to amend their first amended petition under K.S.A. 2013 Supp. 60-215 for any abuse of judicial discretion.

60

See *Johnson v. Board of Pratt County Comm'rs*, 259 Kan. 305, Syl. ¶ 14, 913 P.2d 119 (1996). We will declare the district court's decision an abuse of discretion only if Plaintiffs demonstrate it is: (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. See *Critchfield Physical Therapy v. The Taranto Group, Inc.*, 293 Kan. 285, 292, 263 P.3d 767 (2011) (means of abuse of discretion); *Harsch v. Miller*, 288 Kan. 280, 293, 200 P.3d 467 (2009) (burden of proof).

*Governing principles*

Our Supreme Court has recognized at least five valid justifications for denying a motion to amend a pleading despite our broad notice-pleading principles discussed above. They include: (1) undue delay, (2) bad faith or dilatory motive on the part of the movant, (3) repeated failure to cure deficiencies by amendments previously allowed, (4) undue prejudice to the opposing party by virtue of allowance of the amendment, and (5) futility of amendment. *Johnson*, 259 Kan. at 327 (quoting *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 [1962]). In denying Plaintiffs' motion to amend, the district court found all of these justifications applicable except the third.

Before reviewing that decision for any abuse of discretion, some additional factual background is necessary. Plaintiffs moved to file a second amended petition on December 21, 2011—more than 10 years after they filed their first amended petition. Their motion followed on the heels of Judge Murphy's ruling that Plaintiffs had raised but a single claim for a wholesale price-fixing conspiracy. In support of their motion, Plaintiffs first argued below, as they do on appeal, that their motion to amend was little more than "a 'belts and suspenders' move" necessary only to "even more clearly define its non-price allegations" or provide "a better pleaded claim."

If, in fact, the second amended petition did not materially alter Plaintiffs' claim, then they can hardly claim prejudice from the court's denial of their motion. But for the

61

reasons discussed earlier in defining the scope of Plaintiffs' claim for summary judgment purposes, we reject Plaintiffs' position that this was nothing more than a clarification of claims already raised in their first amended petition. Rather, we conclude Plaintiffs' motion to amend was an attempt to state new and different claims.

But Plaintiffs contend the district court abused its discretion by failing to provide "any reasoning at all" in support of its denial of their motion to amend. We find no support for this contention. The district court adopted the reasons advanced by Defendants in their opposition to the motion: undue delay would result, the class had shown bad faith or a dilatory motive, Defendants would be prejudiced, and the amendment would be futile.

Defendants point out that Plaintiffs moved to file their second amended petition 12 years after the case was filed, more than 10 years after the class was certified, 6 years after discovery was closed, and less than 1 month before the hearing on Defendants' summary judgment motions. Amending Plaintiffs' petition to assert new causes of action would have materially altered the course of the case and its final resolution. It would have required the court to revisit the class certification issue and, at a minimum, provide new notice to members of the class regarding these new claims. For these reasons alone, we find no abuse of discretion in the district court's ruling. Thus, we need not address the other reasons expressed by the district court.

DENIAL OF PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT

Plaintiffs' final issue on appeal concerns the denial of their motion for default judgment on three motions for partial summary judgment they filed. Before we can address their argument, more background is necessary.

At the same time Plaintiffs filed their joint response to Defendants' various motions for summary judgment, Plaintiffs filed their own three motions for partial summary judgment. Defendants responded with a joint motion to defer briefing on those motions. In support, Defendants pointed out that Plaintiffs' summary judgment motions were all based on the argument that Plaintiffs had stated something more than a price-fixing claim, and any such argument would be moot if the district court granted Defendants' motions for summary judgment, which were based on the premise that Plaintiffs stated only a price-fixing claim. Plaintiffs responded with a motion for default judgment, arguing that Defendants had not properly responded to Plaintiffs' summary judgment motions.

Following a hearing in October 2011, the district court denied Plaintiffs' motion for default and granted Defendants' motion to defer briefing on Plaintiffs' summary judgment motions. While the district court agreed with Plaintiffs' position that the Defendants' motion to defer did not necessarily fall within the parameters of a response to a motion for summary judgment anticipated under K.S.A. 2013 Supp. 60-256(f), the district judge found:

> "I think in this case and in these circumstances, where continuances have been granted to all of the parties over this 10, 12-year period, I'm not going to find that default judgment is appropriate. I think that the motion to defer served as a response, maybe not albeit perfect, but I think it is a response that takes it out of the default arena."

Plaintiffs contend here that this was error. Defendants respond that the court was well within its discretion to deny the motion for default judgment.

*Standard of review*

We review the district court's decision on a motion for default judgment for an abuse of discretion. See *Bazine State Bank v. Pawnee Prod. Serv., Inc.*, 245 Kan. 490, Syl. ¶ 1, 781 P.2d 1077 (1989), *cert. denied* 495 U.S. 932 (1990); *Lara v. Vasquez*, 33 Kan. App. 2d 128, 130-31, 98 P.3d 660 (2004), *rev. denied* 279 Kan. 1006 (2005).

Plaintiffs contend the district court abused its discretion because the denial of their motion for a default judgment was premised on an error of law. They argue that "there is no such thing as a motion to defer"; and, if Defendants' motion was meant to be a motion to continue, their response had to be accompanied by the statutorily required K.S.A. 2013 Supp. 60-256(f) affidavit.

Defendants initially respond that the class' argument is based on two faulty premises: (1) that Plaintiffs' motions for summary judgment were procedurally proper in the first place; and (2) that Defendants failed to respond.

Defendants further point out that even if they failed to respond, the summary judgment sought by the class for $7.58 billion was inappropriate in this case. We agree. Given our holding that Plaintiffs' lawsuit was not based on the "non-price" claims that underlie their motions for summary judgment, default partial summary judgments on those claims would not have been appropriate. See K.S.A. 2013 Supp. 60-256(e)(2) (when opposing party fails to respond to motion for summary judgment, summary judgment should, *if appropriate*, be entered against that party).

Motions for default judgment are not favored in the law. *Bazine State Bank*, 245 Kan. at 495. We find no abuse of discretion in the district court's denial of Plaintiffs' motion for a default judgment on their motions for partial summary judgment. Further,

64

given our decision upholding summary judgment for Defendants, these motions are now moot.

We need not consider Defendants' contingent cross-appeals from the class certification order and the order compelling the production of documents because these issues are now moot.

Affirmed; cross-appeals dismissed.